[No. D019365. Fourth Dist., Div. One. July 28, 1995.]

BRANDON LEE BRANCO, Plaintiff and Appellant, v.
KEARNY MOTO PARK, INC., et al., Defendants and Respondents.

**COUNSEL**

Girardi & Keese, Thomas V. Girardi, James B. Kropff and Robert W. Finnerty for Plaintiff and Appellant.

Shifflet, Walters, Kane & Konoske, Douglas F. Walters and William T. Pascoe for Defendants and Respondents.

**OPINION**

**HUFFMAN, J.**—Brandon Lee Branco (hereafter Branco) appeals from a summary judgment in favor of Kearny Moto Park, Inc. (hereafter KMP), Debbie Badders, Jerry Badders, the American Bicycle Association (hereafter ABA), and the City of San Diego (hereafter sometimes referred to collectively as defendants)[1] arising from Branco's complaint alleging, inter alia, that the negligent design of an expert caliber jump at KMP's bicycle motocross (BMX) course caused him to suffer injury. Premised on the duty of a sponsor of a sports activity not to increase the risks inherent in a sport, we hold there is a triable issue of fact whether KMP's jump was negligently designed. Accordingly, we reverse the summary judgment.

---

[1]The summary judgment was not applicable to the other named defendants: GT Bicycles, Inc., Bike Shop III, and BMX Action Trick Team Corporation.

## Factual and Procedural Background

On May 19, 1991, 17-year-old Branco, while racing his bicycle on KMP's BMX course, was injured when his bicycle crashed and struck the side wall of the landing area of an expert caliber jump.[2]

KMP is a nonprofit, mutual benefit corporation, and (according to a declaration submitted by one of KMP's officers) its officers, who design and operate the moto park, serve on a volunteer basis.[3] KMP's promotional literature indicates that riders race according to age and skill class; new riders can learn and race safely with other new riders; and as they gain experience, they move up in skill class.[4] KMP also provided opportunities for the participants to learn riding techniques from professional BMX racers. ABA's promotional literature claimed BMX was "the safest of all the action youth sports."[5]

The parties agreed that by its nature, BMX racing includes bumps, jumps, turns, straightaways and obstacles. The million dollar jump, on which Branco was injured, is also referred to as the "million dollar doubles," and consists of two hills, described by plaintiff's attorney as "two bumps joined together in a saddle-like configuration."

Branco had several years' experience riding BMX bicycles,[6] and he had had numerous prior falls from his bicycle, including one which resulted in a broken collarbone when he misjudged a street curb and flipped over the

---

[2]According to Branco's attorney, Branco suffered a broken neck resulting in permanent quadriplegia.

[3]Jerry and Debbie Badders are officers of the corporation; the City of San Diego is owner and lessor of the property where KMP operates.

[4]KMP's literature states: "Riders race according to age and skill class so everybody gets the opportunity to compete on a fair and competitive level. Even brand new riders have the chance to learn and race safely with other new riders. As riders begin to gain experience, they move up in skill class. The skill classes are based on the number of wins a rider has in his/her birthday year. All riders start as a novice and work up to intermediate and expert classes as they get better and improve their racing skills. . . . [¶] You'll need some padding on the frame. . . . For your protection, a helmet is required. Long-sleeved shirt and tennis shoes and blue jeans round out the list of things you'll need."

[5]ABA's literature states: "Statistics prove that BMX is the safest of all the action youth sports. A BMX rider is required to wear his safety equipment every time he is on the track. The rider must wear a helmet, long pants and long sleeves or elbow pads. Track operators also help the racer inspect his bicycle so that it will be safe for competition. [¶] Safety comes first at every track. Experienced first-aid people are always on hand to care for the racers."

[6]At KMP, Branco was classified in the "17 Novice" class. Classifications included novices, intermediates, and experts.

handlebars. He suffered the injury at KMP when he "wheelied"[7] the "million dollar jump" at the BMX course. He had intended to "roll"[8] the million dollar jump, since doing a wheelie would be "stupid" because it would slow him down,[9] but instead he found himself doing a wheelie. Prior to his injury, he had never wheelied the million dollar jump before, but had rolled it, and had never had any problems with it. Slower speed and more control and skill is required to wheelie rather than roll a jump. A couple of times, he had seen other riders wheelie up the million dollar jump, but did not observe them have any difficulties. He had seen people "buckle"[10] and almost lose control on the second part of the million dollar jump. Brandon thought "jumping" the million dollar jump was too dangerous,[11] but he did not think doing a wheelie was too dangerous.

Defendants' expert declared that each BMX track may incorporate its own specific design, and the jumps are designed so that they may be traversed by either riding over them, or jumping over them by making the bicycle airborne. In his opinion, KMP's jumps complied with the guideline that all jumps could either be ridden over or jumped by making one or both wheels airborne. Further, the president of the ABA declared that the ABA sanctions tracks, each sanctioned track must comply with certain rules and regulations, and in his opinion the jumps at KMP were "such that can be expected at any BMX track."

In contrast, Branco's expert identified the following characteristics of the million dollar jump. The first hill of the jump is too steep for the use to which it was put; its 63-degree angle combined with the curvature of the hill creates an 80-degree angle; the steepness of the angle puts the rider at extreme risk because the rider's center of gravity tends to lift up as he approaches the jump, which puts the rider in an extremely unbalanced position. Second, the distance between the two hills of the jump is so great

---

[7]A "wheelie" means pulling on the handlebars and leaning back.

[8]To "roll" apparently means to simply ride over it with both wheels on the ground.

[9]On the day of his injury, his brother told him he should "wheelie the doubles," and Brandon responded that was stupid because he would have to slow down to get more control. It appears from his deposition testimony that Brandon thought slowing down was stupid because he wanted to go fast, so as to finish before the other riders.

[10]Brandon had never seen anyone crash on the million dollar jump. He had seen people "buckle," which meant that they land too far forward and the front tire hits first, causing them to almost go over the handlebars.

[11]Prior to the day of his injury, his friends had offered him a bribe if he would jump the million dollar jump. Brandon explained that if a rider tried to jump, and did not jump the whole thing, he could "case it and eat it," which meant the back tire hits the ground first, then the front tire slams down, and the rider could flip over the handlebars. Brandon thought jumping it was too dangerous for him because he does not like heights, whereas he did not have the sensation of being too high when he did wheelies.

that the cyclist has to be at a very high rate of speed to make the second jump.[12] The expert opined that both of these factors tend to put riders at risk or "at the very end of their envelope of ability."

Branco's expert opined that the slope of the first hill of the jump led to the accident since it caused the rider's center of gravity to rise too abruptly. The expert elaborated that most BMX tracks he had seen, which include a jump where the rider aims to get skyborne, will have a very gentle approach slope to the jump, i.e., a 15- to 20-degree angle with a very long lead-up, and then an abrupt drop-off on the other side, which gives the rider the feeling of jumping the bike, but does not put him at risk. KMP's million dollar jump was the only one he could remember seeing with such an abrupt change in slope.

In granting the motion for summary judgment, the trial court acknowledged that Branco's subjective knowledge of the risk was irrelevant to the issue of duty under *Knight* v. *Jewett* (1992) 3 Cal.4th 296, 314-315 [11 Cal.Rptr.2d 2, 834 P.2d 696] (discussed below). The court determined that defendants owed no duty to Branco, stating that the deposition testimony of plaintiff's expert did not create a triable issue of fact as to whether defendants increased the risks above those inherent to BMX racing. The court also noted that Branco was a participant rather than a student being coached by the defendants.

ANALYSIS

■ A motion for summary judgment shall be granted if all the papers submitted show there is no triable issue of any material fact and that the moving party is entitled to a judgment as a matter of law. (Code Civ. Proc. § 437c, subd. (c); *Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) The evidence of the moving party should be strictly construed, and that of the opponent liberally construed, and any doubts as to the propriety of granting the motion should be resolved in favor of the party opposing the motion. (*Molko, supra,* at p. 1107.) A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail. (*Ibid.*) On appeal from a summary judgment, our review is de novo, and we independently review the evidence submitted. (*Davis* v. *Gaschler* (1992) 11 Cal.App.4th 1392, 1396 [14 Cal.Rptr.2d 679]; *Saldana* v. *Globe-Weis Systems Co.* (1991) 233 Cal.App.3d 1505, 1511-1513 [285 Cal.Rptr. 385].)

---

[12]The portion of the expert's deposition testimony included on appeal does not indicate whether the expert believed the jump was unsafe when taken by rolling, doing a wheelie, and/or jumping.

■ As we explain below, we hold there is a duty to refrain from utilizing BMX jumps which by design pose an extreme risk of injury, and there is a triable issue of material fact whether that duty was breached by virtue of the design of the million dollar jump.

■ In *Knight* v. *Jewett, supra*, 3 Cal.4th at pages 314-315, our Supreme Court[13] held that the doctrine of assumption of risk involves two components, primary and secondary assumption of risk. With primary assumption of risk, the defendant owes no duty to the plaintiff and the doctrine operates as a complete bar to recovery. With secondary assumption of risk, the defendant owes a duty, but the plaintiff proceeds to encounter a known risk imposed by the defendant's breach of duty. The doctrine of secondary assumption of risk is part of the comparative fault scheme where the trier of fact considers the relative responsibility of the parties in apportioning the loss resulting from the injury.

Accordingly, we first evaluate whether the defendant's conduct breached a legal duty of care to the plaintiff, i.e., whether the defendant had a legal duty to avoid the conduct or to protect the plaintiff against a particular risk of harm. (*Knight* v. *Jewett, supra*, 3 Cal.4th at pp. 315-317.) The nature of a defendant's duty in the sports context depends heavily on the nature of the sport itself. (*Ibid.*) Additionally, the scope of the duty frequently depends on the defendant's role in, or relationship to, the sport. (*Id.* at pp. 316-317.)

■ As recognized by the trial court, *Knight* sets forth the following standard to guide the determination of the duty of an operator of a sports facility:[14] "*Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport.*" (*Knight* v. *Jewett, supra*, 3 Cal.4th at pp. 315-316, italics added.)

---

[13]See *Bush* v. *Parents Without Partners* (1993) 17 Cal.App.4th 322, 327 [21 Cal.Rptr.2d 178], and *Galardi* v. *Seahorse Riding Club* (1993) 16 Cal.App.4th 817, 821, footnote 1 [20 Cal.Rptr.2d 270], for discussions of the differences between the justices' views in *Knight*, which was a plurality opinion.

[14]On its facts, *Knight* involves a defendant who was a coparticipant in a football game. Affirming a summary judgment, *Knight* focuses on the role of the defendant (i.e., a coparticipant rather than an owner of a sports facility), and holds a duty arises only if the participant in an active sport intentionally injures another player or engages in conduct that is so reckless as to be totally outside the range of the ordinary activity involved in the sport. (*Knight* v. *Jewett, supra*, 3 Cal.4th at p. 320.)

*Knight* utilizes the example of a ski mogul to illustrate a risk inherent in a certain sport as to which there is no duty of care.[15] That is, although "moguls on a ski run pose a risk of harm to skiers that might not exist were these configurations removed, the challenge and risks posed by the moguls are part of the sport of skiing, and a ski resort has no duty to eliminate them." (*Knight* v. *Jewett, supra,* 3 Cal.4th at p. 315.) This duty analysis is not dependent on the plaintiff's subjective knowledge or appreciation of the risk. Thus, a defendant owes no duty to a plaintiff who falls while skiing over a mogul, even if he or she is a total novice with no knowledge of skiing. (*Id.* at p. 316.) In contrast, a ski resort does have a duty to use due care to maintain its towropes in a safe, working condition so as not to expose skiers to an increased risk of harm, since the latter type of risk is not a risk inherent in the sport. Even if the plaintiff actually were aware that a ski resort on occasion has been negligent in maintaining its towropes, he or she could still recover for the negligence.[16] (*Id.* at pp. 315, 316.)

*Harrold* v. *Rolling J Ranch* (1993) 19 Cal.App.4th 578, 585 [23 Cal.Rptr.2d 671], applied the standard delineated in *Knight,* stating that commercial operators of sports and recreational facilities owe a duty to their patrons to ensure the facilities and related services which are provided do not increase the risk of injury above the level inherent in the sport or recreational activity itself. The court observed the duties of a commercial operator of a horse-riding facility could include the duty to supply horses which were not unduly dangerous, to warn patrons renting a given horse of its predisposition to behave in ways which added to the ordinary risk of horse riding, the duty not to provide faulty saddles, not to provide dangerous trails, etc. However, *Harrold* holds the duty did not extend to providing horses that never spooked, since such sudden movements were "just as inherent in horseback riding as the presence of moguls on a ski slope are to skiers." (*Id.* at pp. 586-588.)[17]

In *Galardi* v. *Seahorse Riding Club, supra,* 16 Cal.App.4th 817, 823, the court held that an instructor at a horse riding club, who was assisting the plaintiff during her practice jumps, had a duty to take care that the jumping array she (the instructor) set up was not beyond the capability of the horse

[15]A mogul is "a bump or mound of hard snow on a ski slope." (Random House Dict. of the English Language (2d ed. 1987).)

[16]*Knight* specifies that the duty inquiry does not turn on the reasonableness of plaintiff's conduct in choosing to subject himself to the risks of the activity; nor on the plaintiff's subjective knowledge of, and voluntary choice to encounter, the risk; nor on whether plaintiff impliedly consented to relieve or excuse defendant from any duty of care. (*Knight* v. *Jewett, supra,* 3 Cal.4th at p. 315.)

[17]In *Harrold,* a horse suddenly spooked, and the plaintiff rider, who was not holding onto the reins, was thrown to the ground. (*Harrold* v. *Rolling J Ranch, supra,* 19 Cal.App.4th 578.)

and rider. (*Id.* at pp. 822-823.) Recognizing that although the risk of injury inherent in the activity (which included engaging in increasingly higher jumps and at shorter intervals until at some point the obstacles could no longer be cleared without substantial contact) could not be eliminated and in fact created the challenge which defined the sport, the court held there was a triable issue of fact whether the defendants had negligently deployed the jumps at unsafe heights or intervals.[18] (*Ibid.*) *Galardi* points out that the plaintiff was not injured during a competition, and she had placed her training in the hands of defendants who were employed to instruct her and coach her, and they inferentially had superior knowledge and experience concerning the sport. (*Id.* at pp. 823-824.)

In support of its holding, *Galardi* refers to *Tan* v. *Goddard* (1993) 13 Cal.App.4th 1528, 1535 [17 Cal.Rptr.2d 89], where the court concluded that a jockey racing school owed a duty to see that the horse assigned to a student was safe to ride under the conditions the trainer prescribed for that activity.[19]

Although the instructor/student relationship was considered in determining the scope of the duty in the *Galardi* and *Tan* cases, there is nothing in those cases which suggests no duty can exist absent such a relationship.[20] The analysis in *Knight* (and reiterated in *Harrold*, which does not involve an instructor/student relationship) indicates that an operator of a sporting facility has a duty to use due care not to increase the risks to a participant over and above those inherent in the sport. (*Knight* v. *Jewett, supra,* 3 Cal.4th at pp. 316-317.) *Knight* cites with approval cases which do not involve instructor/student relationships, and which utilize a standard premised on *"the steps the sponsoring business entity reasonably should be obligated to take in order to minimize the risks without altering the nature of the sport."*[21] (3 Cal.4th at p. 317, italics added; see also *Bush* v. *Parents Without Partners, supra,* 17

---

[18]The instructor in *Galardi* had raised the height of the jumps without lengthening the distance between them. (*Galardi* v. *Seahorse Riding Club, supra,* 16 Cal.App.4th at p. 820.)

[19]The plaintiff in *Tan* was injured, while following the trainer's directions, on a horse that was known to be behaving abnormally. (*Tan* v. *Goddard, supra,* 13 Cal.App.4th at p. 1531.)

[20]Here, Branco was injured during a competition, was not doing a "wheelie" in response to any specific instruction from an instructor, and had not "employed" KMP in a commercial context to provide him instruction or services. However, KMP's relationship with the BMX riders could be viewed as carrying some of the indicia of an instructor/student relationship, since KMP in its promotional literature offered the activity to riders of any skill level, with new riders having the opportunity to learn, gain experience, and move up in skill class, and offered opportunities to learn techniques from professional BMX racers. Further, Branco could be characterized as having traversed the million dollar jump in a manner consistent with KMP's instructions, since KMP did not disallow "wheelies" on the million dollar jump.

[21]For example, *Knight* evaluates a case in which a baseball stadium owner was held liable for its failure to provide a patron protection from flying bats, at least in the area where the greatest danger exists and where such an occurrence is reasonably to be expected. (*Knight* v. *Jewett, supra,* 3 Cal.4th at p. 317, citing *Ratcliff* v. *San Diego Baseball Club* (1938) 27

Cal.App.4th at p. 329 [primary assumption of risk did not preclude cause of action premised on increased risk of falling created by spreading slippery substance on floor by organization sponsoring recreational dance]; *Morgan* v. *Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127 [40 Cal.Rptr.2d 249] [operator of golf course owes duty to minimize risk players will be hit by golf balls].)

 It is not unreasonable to expect a BMX course to refrain from utilizing jumps which by design create an extreme risk of injury. Certainly the jumps, and falls, are inherent to the sport, and under the doctrine of primary assumption of risk, there is no duty to eliminate the jumps entirely, and no duty to protect from injury arising from reasonably designed jumps. However, the sport does not inherently require jumps which are designed in such a way as to create an extreme risk of injury.[22] Accordingly, premised on the duty not to utilize dangerously designed jumps, this case falls under the secondary assumption of risk category, and issues pertaining to Branco's comparative fault are for the trier of fact to decide. Branco's expert's opinions regarding the design of the jump create a triable issue of material fact whether the million dollar jump was designed in such a way as to create an extreme risk of injury.[23]

In closing, we note that we do not view man-made bicycle jumps as comparable to the ski moguls which *Knight* states need not be eliminated since the moguls are part of the challenge and risks of the sport of skiing. There is a distinction between the degree of control exercised over the creation of the nature-made obstacles involved in the sport of skiing (see generally, *O'Donoghue* v. *Bear Mountain Ski Resort* (1994) 30 Cal.App.4th 188, 193 [35 Cal.Rptr.2d 467]), as compared to the man-made obstacles of the BMX course involved in the instant case. Thus, whereas no duty is owed to the skier injured on a mogul, a duty is owed to a bicycle racer injured on a bicycle jump which by its design creates an extreme risk of injury.[24]

---

Cal.App.2d 733, 736 [81 P.2d 625].) The baseball spectator was walking in the stands between home plate and first base when she was hit by an accidentally thrown bat. (*Knight, supra,* at p. 317.)

[22]Indeed, ABA's literature refers to BMX racing as "the safest of all action youth sports."

[23]Given our analysis premised on negligent design of the jump, we need not address KMP's contention that the summary judgment may not be reversed on a "failure to warn" theory since that theory was not specifically pleaded in the complaint but first raised in Branco's opposition to the motion for summary judgment.

Also, we need not discuss Branco's argument that the primary assumption of risk doctrine should not be applied to minors. For purposes of this case, the duty not to utilize a jump which creates an extreme risk of injury applies equally to minors and adults.

[24]There is no issue in this appeal regarding the potential liability as between the various defendants, and nothing in this opinion is meant to express any views on this matter.

## DISPOSITION

The summary judgment is reversed.

Benke, Acting P. J., and Nares, J., concurred.

Respondents' petition for review by the Supreme Court was denied November 16, 1995. Arabian, J., and Baxter, J., were of the opinion that the petition should be granted.