[Nos. D031688, D032830. Fourth Dist., Div. One. Nov. 13, 2000.]

DAVID W. HUFFMAN, Plaintiff and Appellant, v.
CITY OF POWAY et al., Defendants and Respondents.

## COUNSEL

Robert B. Coffin for Plaintiff and Appellant.

John M. Rea, Vanessa L. Holton and Linda L. Peters for Department of Industrial Relations as Amicus Curiae on behalf of Plaintiff and Appellant.

Daley & Heft, Robert W. Brockman, Jr., Scott E. Patterson and Lee H. Roistacher for Defendants and Respondents.

## OPINION

**McDONALD, J.**—Appellant David W. Huffman, an actor in a musical play coproduced by Reunion Productions (Reunion) and respondent Arts Alive! Foundation (AAF), was injured while rehearsing the play at a facility owned and operated by respondent City of Poway (City). Huffman's lawsuit alleged claims for negligence against AAF and for premises liability (Gov. Code, § 835) against City. The jury found in favor of Huffman, assessed comparative negligence among the parties, and awarded damages of $93,700.

However, the trial court entered judgments in favor of AAF and City. First, the trial court ruled that because AAF was Huffman's employer and had secured workers' compensation protection, Huffman's exclusive remedy was to collect workers' compensation benefits and he could not pursue a tort claim against AAF. Second, the trial court ruled City was not liable under Government Code section 835 because Huffman was injured on property that City did not own or control. Huffman's appeal challenges both rulings.

### I

### FACTUAL BACKGROUND

#### A.  *The Actors*

Reunion produced the musical play Dracul at the San Diego Lyceum Theater (the Lyceum) during the summer of 1995. Huffman was a professional actor hired by Reunion to perform roles in the play.

After completing its run at the Lyceum, the play was moved to the Poway Center for the Performing Arts (the Center) pursuant to a coproduction agreement between Reunion and AAF.[1] The Center is owned and operated by City.

#### B.  *The Set*

Huffman participated in a scene in the play, entitled Phobia, during which actors enter and depart from the stage through trapdoors in the stage apron.

---

[1]AAF was a nonprofit public benefit corporation whose primary purpose was to stage theater productions at the Center.

The trapdoors were arranged in a triangular configuration at the Lyceum. However, when the play moved to the Center, the configuration and spacing of the trapdoors was changed to accommodate the Center's different stage apron configuration.[2]

Under the coproduction agreement, Reunion supplied the props and stage scenery, the actors, and the director and assistant director; AAF provided the Center and a technical director. Reunion provided the trapdoor mechanisms that were used at the Lyceum, and AAF installed the mechanisms into the Center's stage apron.[3] At the time of Huffman's injury, the trapdoors were open for rehearsal of the Phobia scene.

### C. *The Injury*

Because the Lyceum's stage had different dimensions from the Center's stage, and the location of the trapdoors had been reconfigured, it was necessary to remount and reblock the Phobia scene.[4] On October 13, 1995, the troupe convened at the Center for a rehearsal under the direction of Mr. Woodhouse, the director of Dracul. Hamlin was also present at the rehearsal.

The purpose of the rehearsal was to familiarize the cast with the new stage and trapdoor configuration and to reblock the scene. Because the Phobia scene required use of the trapdoors, Woodhouse instructed that the trapdoors be open for the rehearsal. Before the rehearsal began, the actors familiarized themselves with the trapdoors by inspecting and crawling in and out of the door openings. Woodhouse cautioned the actors to familiarize themselves with the new configuration and to move carefully and slowly through the scene.

Huffman saw that the trapdoors were closer together than at the Lyceum and were open. He recognized the different configuration would require extensive adjustments in the blocking of the scene. Huffman suggested that portions of the choreography be moved from the stage apron to the stage away from the trapdoors, but Woodhouse rejected that suggestion and instructed Huffman to walk through his steps between the trapdoors. Huffman stated "someone better watch me" before beginning his movements.

---

[2]At the Center, the trapdoors were installed in a straight line and closer to each other because the Center's stage apron was smaller than the Lyceum's stage apron.

[3]The traps were installed under the direction of Mr. Hamlin, the technical director supplied by AAF. Hamlin was an employee of City.

[4]Remounting is the process of adapting a production to a new venue and includes reblocking or revising the actors' movements and locations within a scene to accommodate the layout of the new stage.

Huffman knew the open trapdoor was behind him when he began rehearsing the Phobia scene. Using the original blocking, he took two backward steps away from the center trapdoor and then began to pivot to face the auditorium as he sang. As he pivoted he fell through an open trapdoor. No one called out a warning or tried to block his movement into the open trapdoor. He fell to a platform below the stage apron and injured his leg.

### D.   *Huffman's Safety Expert*

Mr. Schreiber, Huffman's safety expert, testified there were numerous safeguards that should have been but were not implemented to prevent Huffman's injury. First, he testified the trapdoors should have remained closed during the initial walk-throughs to give the actors time to become familiar with the new configuration. Second, he testified that when the trapdoors were open there should have been either a guardrail or, if that was impractical, a person should have been stationed at the opening to guard against falling through the opening. Third, he testified that the opening should have been made more visible by using Glo-Tape and understage lighting; these elements would have more clearly alerted the actors to the floor openings.[5]

II

PROCEDURAL BACKGROUND

### A.   *The Workers' Compensation Claim*

Within weeks following the accident, Huffman filed a claim for workers' compensation benefits with City, claiming he was an employee of City.[6] Huffman's application was accepted and processed by the California Joint Powers Insurance Authority (CJPIA), an insurance pool of 80 municipalities including City. The administrator for CJPIA determined AAF was a protected party under its workers' compensation program and paid approximately $17,000 of Huffman's medical bills.

---

[5]Curiously, photographs of the underside of the trapdoors, introduced as exhibits at trial and lodged on appeal, show that a parcan light pointing up toward the trapdoor openings was present under the stage. The photographs were taken two weeks after the accident, and Huffman represented these accurately reflected the condition of the equipment on the date of the accident. However, it is unclear whether the understage lights were illuminated during the rehearsal.

[6]Huffman's claim stated that because he was employed by AAF under the coproduction agreement, City was a co-employer from whom Huffman could seek workers' compensation payments.

## B. *The Lawsuit and Judgment*

Huffman's third amended complaint alleged claims against AAF and City for premises liability, negligence and negligence per se.

On Huffman's claim against AAF, the trial court ruled in limine that if the jury found Huffman was an employee of AAF, his claim against AAF was barred by the exclusivity provisions of Labor Code section 3602, subdivision (a). The jury found by special verdict that Huffman was employed by AAF and the court granted a directed verdict in favor of AAF. We evaluate Huffman's challenge to this ruling in part III.

On Huffman's claim against City, the jury was instructed on the elements for holding a public entity liable for dangerous conditions on property owned or controlled by the entity. The jury found by special verdict that City maintained a dangerous condition on its public property and had notice of or created the dangerous condition, and the dangerous condition was a legal cause of Huffman's injuries. However, in a posttrial ruling the trial court concluded City did not own or control the property on which the dangerous condition was located and granted City's motion for judgment notwithstanding the verdict. We evaluate Huffman's challenge to this ruling in part IV.

## III

### AAF's Liability—The Workers' Compensation Issue

Huffman argues that under Labor Code section 3700[7] an employer must secure the payment of workers' compensation by either purchasing insurance or securing a certificate of consent to self-insure from the state Director of Industrial Relations (DIR); absent compliance with one of these two alternatives an employee is not subject to the exclusivity provisions of section 3602, subdivision (a), and may bring a tort action against the employer. Huffman contends AAF did not satisfy either of those two alternatives and therefore the trial court erred by finding Huffman was barred from pursuing his tort claim against AAF. AAF contends, however, that these alternatives are not exclusive and that AAF's method of securing workers' compensation was legally sufficient to entitle it to the exclusivity bar of section 3602, subdivision (a).[8]

---

[7]All statutory references in part III are to the Labor Code unless otherwise specified.

[8]AAF alternatively argues that because Huffman was required to affirmatively plead both the employment relationship and the employer's default in securing workers' compensation, his failure to do so is sufficient to affirm the judgment in favor of AAF. We doubt that the cases relied on by AAF stand for the proposition it urges. However, it is unnecessary to

## A. *The In Limine Motions*

Huffman and AAF litigated the workers' compensation exclusivity issue by pretrial in limine motions.[9] AAF did not have workers' compensation insurance. However, AAF asserted it provided the required workers' compensation coverage to its employees as a protected party under City's self-insurance program administered by CJPIA.

Ms. France, the senior risk manager for CJPIA, testified CJPIA administered the workers' compensation self-insurance program for the pool of its member municipalities.[10] Membership in CJPIA is restricted to public entities. CJPIA received from DIR a certificate to self-insure for workers' compensation coverage; City participated in CJPIA and had in its own name an affiliate certificate of self-insurance issued by DIR. AAF was not a member of CJPIA and did not have a certificate of self-insurance issued by DIR.

CJPIA also administers a general liability self-insurance program for its members. Under CJPIA's memorandum of coverage for its general liability program, the pool provides coverage for its members' liability for specified types of claims. However, the memorandum of coverage expressly excludes workers' compensation claims from this coverage.

CJPIA, following its normal procedures, received, processed and accepted Huffman's application for workers' compensation benefits, and paid benefits because it concluded AAF was a covered party under CJPIA's workers' compensation program. France relied on the definitions of protected parties in CJPIA's memorandum of coverage for its general liability program to

---

examine this claim because we are cited nothing in the record demonstrating that AAF raised this contention below. (*Nelson v. Dept. Alcoholic Bev. Control* (1959) 166 Cal.App.2d 783, 788 [333 P.2d 771] [when case tried on assumption that pleadings state a claim or raise an issue, parties cannot change their theory for purposes of appellate review].)

[9]AAF's motion sought to preclude Huffman from introducing evidence on his tort claim against AAF because Huffman (1) admitted he was AAF's employee and (2) timely received workers' compensation benefits from AAF. Accordingly, argued AAF, Huffman was limited to his workers' compensation remedy. Huffman's countermotion asserted that because AAF was his employer but had not secured workers' compensation coverage in compliance with section 3700, Huffman was entitled to pursue his tort action against AAF and AAF was precluded by section 3708 from relying on the affirmative defenses of assumption of risk or comparative fault.

[10]Under CJPIA's self-insurance program for workers' compensation, the pool paid the first $500,000 of an individual's claim; amounts in excess of $500,000 were covered by the pool's excess insurance policy that named the pool members as additional insureds.

conclude AAF was also protected under CJPIA's workers' compensation program.[11]

### B. *The Ruling and Judgment in Favor of AAF*

The court ruled that section 3602, subdivision (a)'s exclusive remedy provisions would apply to bar Huffman's tort claim against AAF if the jury concluded Huffman was AAF's employee. The court reasoned that (1) Huffman had received workers' compensation benefits in a timely fashion, (2) AAF was acting as an agency of City to perform certain limited functions, and (3) no public policy would be served by requiring AAF to obtain its own certificate of self-insurance or by precluding AAF from being included under City's workers' compensation self-insurance coverage.

At trial, the jury found Huffman was employed by a joint venture, consisting of AAF and Reunion. The trial court therefore granted a directed verdict in favor of AAF based on the exclusivity provisions of section 3602, subdivision (a).

### C. *Analysis*

Under section 3602, subdivision (a), the exclusive remedy of an injured employee against his employer for a work-related injury is, subject to specified exceptions, the right to workers' compensation benefits. An exception to exclusivity is set forth in section 3706, which provides that if the employer "fails to secure the payment of compensation" the employee may pursue a claim for damages against the employer. (*Hernandez v. Chavez Roofing, Inc.* (1991) 235 Cal.App.3d 1092, 1094 [286 Cal.Rptr. 919].)

Section 3700 provides an employer two methods to secure the payment of compensation. First, the employer may purchase workers' compensation insurance from one or more insurers duly authorized to issue workers' compensation insurance in California. (§ 3700, subd. (a).) It is undisputed that AAF did not avail itself of this alternative.

Second, the employer may obtain from DIR a certificate of consent to self-insure for workers' compensation (the certificate). The statutory scheme

---

[11] Section 5 of the general liability memorandum of coverage contains definitions of "protected parties" under its coverage. France relied on two of those sections for her conclusion that AAF was covered. First, section 5.B.3 defined "protected parties" to include "[a]ny nonprofit California Corporation . . . under written contract with the Member to perform specified functions under the Member's direction and control." Second, section 5.C extended coverage to persons or entities to whom the member was obligated, under a protected contract, to assume the risk of financial loss. France concluded the latter section was relevant because City had an agreement to indemnify AAF's directors against liabilities arising out of the operation of the Center.

distinguishes between private and public entities for purposes of the certificate. A private entity may secure the certificate from DIR if it furnishes satisfactory proof of its "ability to self-insure [workers' compensation claims properly] and to pay [workers' compensation claims] that may become due" to its employees. (§ 3700, subd. (b).) A public entity may secure the certificate from DIR if it furnishes satisfactory proof of its "ability to administer workers' compensation claims properly and to pay workers' compensation claims that may become due" to its employees. (§ 3700, subd. (c).) AAF did not obtain the certificate.

AAF argues that it is entitled to the exclusivity of section 3602, subdivision (a), notwithstanding the absence of insurance or its own certificate, because the statutorily prescribed methods for securing payment of compensation are not exhaustive. Furthermore, if City as a certified self-insurer extends coverage to AAF's employees, AAF has complied with the requirement to secure payment of compensation. AAF's arguments are not persuasive.

Section 3700 states that "[e]very employer . . . *shall* secure the payment of compensation *in one or more of the following ways.*" (Italics added.) The language employed is neither permissive nor suggestive but is mandatory and exhaustive. The only authority cited by AAF to support its argument that an employer may secure compensation by a nonstatutorily specified method is *Rymer v. Hagler* (1989) 211 Cal.App.3d 1171 [260 Cal.Rptr. 76] (*Rymer*).[12] In *Rymer*, a Workers' Compensation Appeals Board judge determined the insurer either provided, or was estopped to deny that it provided, workers' compensation coverage to the employer. (211 Cal.App.3d at p. 1178.) The *Rymer* court held that collateral estoppel principles barred the employee from relitigating the issue of the presence or absence of coverage, and that the employer had secured the payment of compensation where the insurer was bound by operation of law to provide workers' compensation coverage. (*Id.* at pp. 1176-1184.) *Rymer* stands only for the proposition that

---

[12]AAF also cites section 3602, subdivision (d) to argue an employer may secure payment of compensation by methods not specified in section 3700, but concedes it does not apply here. Section 3602, subdivision (d) provides only that when an employee is provided by his employer to a second employer, the second employer need not separately secure workers' compensation insurance if (1) he enters a valid agreement under which the original employer agrees to and does obtain workers' compensation coverage and (2) the original employer in fact secures coverage under subdivision (a) or (b) of section 3700. Thus, section 3602, subdivision (d) does not abrogate, but instead requires, compliance with section 3700: the borrowing employer may piggyback on the original employer only if the original employer complies with section 3700. Moreover, as AAF concedes, this subdivision does not permit AAF to piggyback on City's self-insurance certificate because City was not Huffman's original employer and City did not secure payment of compensation under either subdivision (a) or (b) of section 3700.

an employer satisfies section 3700, subdivision (a)'s requirement of being insured if an insurance company, duly authorized to write compensation insurance, is bound either by a written policy or by operation of law to provide coverage to the employer. *Rymer* does not hold an employer may secure compensation by methods not mentioned in section 3700.

AAF argues that once CJPIA concluded its self-insurance program covered AAF's employees, AAF had coverage from CJPIA under the coverage by estoppel principles described in *Rymer*. However, AAF cites no authority permitting a public entity operating a self-insured workers' compensation program pursuant to a certificate issued under section 3700, subdivision (c) to unilaterally extend its coverage to private entities. To the contrary, private entities do not qualify for self-insured status under section 3700, subdivision (c).[13] Moreover, the administrative regulations specify DIR's certificate of consent to self-insure "shall be valid only to [the entity to whom it was issued and] [e]ach subsidiary or affiliate shall be issued its own certificate to self insure." (Cal. Code Regs., tit. 8, § 15203.9, subd. (a).) AAF's argument would effectively permit any entity holding a certificate to extend its coverage to its subsidiaries or affiliates and thereby eliminate the necessity for these subsidiaries or affiliates to comply with the regulatory requirement for obtaining their own certificates.[14]

Although *Rymer* did not identify what facts supported estopping the insurer from denying coverage, *Rymer*'s discussion of the issue suggests it

[13]Section 3700, subdivision (c) limits its authorized participants to a "county, city, city and county, municipal corporation, public district, public agency, or any political subdivision of the state, including each member of a pooling arrangement under a joint exercise of powers agreement." AAF does not qualify under any of these categories.

[14]In an amicus curiae brief filed in support of Huffman, DIR also notes the regulatory mischief that would be created if an entity holding a certificate of consent to self-insure could, by unilateral and after-the-fact determinations, decide to extend its program to cover uninsured affiliates or subsidiaries, or even to uninsured separate entities with whom it has a business relationship. First, to encourage compliance with the statutory scheme, an employer is subject to possible criminal sanctions (§ 3700.5), penalties (§ 3722) and stop orders on proof it did not have insurance or the certificate. (*Bradshaw v. Park* (1994) 29 Cal.App.4th 1267, 1273-1274 [34 Cal.Rptr.2d 872].) Under AAF's approach, however, an uninsured employer could avoid sanction if any related (or even unrelated) self-insured entity made a unilateral, after-the-fact declaration that the uninsured employer was within the protection of its program. Moreover, a private entity qualifies for self-insured status only when it demonstrates its ability to pay compensation (§ 3700, subd. (a)). It must submit annual financial statements and maintain a specified net worth and net income (Cal. Code Regs., tit. 8, § 15203.2, subds. (a) & (e)), and it must make deposits to secure anticipated liabilities (§ 3701, subds. (a) & (b)) that may be increased if its solvency is impaired (Cal. Code Regs., tit. 8, § 15203.2, subd. (d)). Under AAF's approach, however, uninsured employers could avoid these regulatory controls until an existing self-insured entity unilaterally declared the uninsured employer was within the existing approved program.

relied on traditional estoppel principles.[15] ██ The courts have held that when an insurer by its words or conduct leads a putative insured to believe the insurer is providing coverage, and the putative insured relies on the insurer's conduct and changes his position to his detriment, the insurer may be estopped from denying that it provided coverage. (See, e.g., *Tomerlin v. Canadian Indemnity Co.* (1964) 61 Cal.2d 638, 648 [39 Cal.Rptr. 731, 394 P.2d 571]; *Green v. Travelers Indemnity Co.* (1986) 185 Cal.App.3d 544, 556 [230 Cal.Rptr. 13].) However, under traditional estoppel principles, a party that has not changed its position in reliance on another's actions cannot invoke estoppel. (*In re Lisa R.* (1975) 13 Cal.3d 636, 645 [119 Cal.Rptr. 475, 532 P.2d 123, 90 A.L.R.3d 1017].) ██ Because AAF does not articulate any detrimental change in position it suffered as the result of CJPIA's unilateral, after-the-fact decision to provide coverage to AAF, *Rymer's* coverage by estoppel doctrine does not apply.

AAF also argues that because Huffman applied for and received timely payments of workers' compensation benefits, he suffered no detriment from AAF's lack of insurance and therefore should not be permitted to pursue a claim under section 3706. However, the fact that an employee has received workers' compensation benefits from some source does not bar the employee's civil action against an uninsured employer. (*Strickland v. Foster* (1985) 165 Cal.App.3d 114, 118 [211 Cal.Rptr. 305].) Instead, "[t]he price that must be paid by each employer for immunity from tort liability is the purchase of a workers' compensation policy [and where the employer chooses] not to pay that price . . . it should not be immune from liability." (*Hernandez v. Chavez Roofing, Inc., supra,* 235 Cal.App.3d at p. 1095.)

### D. *Conclusion*

We conclude that because AAF had not secured the payment of compensation as required by section 3700, the trial court erred in directing a verdict against Huffman based on the exclusivity provisions of section 3602, subdivision (a).

---

[15]For example, *Rymer* relied on *Ogden v. Workers' Comp. Appeals Bd.* (1984) 153 Cal.App.3d 786 [200 Cal.Rptr. 406], in which the court at pages 794-795 stated that under certain facts an insurer could be estopped to deny it provided workers' compensation insurance to the employer. *Rymer* also stated coverage by estoppel should be employed to overcome "[t]echnical barriers to coverage caused by administrative or clerical errors," intimating that the employer had been promised coverage and that a formal insurance policy was absent solely due to administrative or clerical error. (*Rymer, supra,* 211 Cal.App.3d at p. 1184.)

IV

CITY'S LIABILITY—THE DANGEROUS CONDITION

█ Huffman argues the order granting City's motion for judgment notwithstanding the verdict must be reversed because there is substantial evidence to support the findings he was injured by a dangerous condition on property owned or controlled by City.[16] City makes several arguments in support of the trial court's order. First, it argues there was no evidence it owned or controlled the property that caused Huffman's injury. Second, it argues that even if it owned or controlled the property, there was no evidence there was a dangerous condition on the property. Third, it argues Huffman's claim is barred by the doctrine of primary assumption of risk because his injury was caused by a risk inherent in the activity in which he was engaged and City did nothing to increase the inherent risk of that activity.

A. *There Is Substantial Evidence City Owned or Controlled the Property*

City argued, and the trial court found, that City did not own or control the property that caused Huffman's injury. City does not dispute it owned the stage, but argues the trial court correctly concluded Huffman was not injured by a dangerous condition of the stage; instead, Huffman was injured on the privately owned trapdoor mechanism.

█ A public entity is liable for dangerous conditions on property it owns (Gov. Code, § 835)[17] but not for dangerous conditions on private property. (*Longfellow v. County of San Luis Obispo* (1983) 144 Cal.App.3d 379, 383 [192 Cal.Rptr. 580].) █ City argues, in essence, that a public entity is not liable for a dangerous condition on property it owns if the dangerous condition is created by privately owned equipment temporarily installed on the public property with the public entity's consent. In *Chavez v. County of Merced* (1964) 229 Cal.App.2d 387 [40 Cal.Rptr. 334], a privately owned power line was knocked down and was on or at the edge of a publicly owned street. The public entity was held liable for the dangerous condition of its road even though the danger was created by the presence of privately owned property. (*Id.* at pp. 394-395.) Similarly, in *Branzel v. City of Concord* (1966) 247 Cal.App.2d 68 [55 Cal.Rptr. 167], a field owned by the city and

---

[16]In reviewing an order granting judgment notwithstanding the verdict, we consider the evidence most favorably to the party in whose favor the verdict had been entered; we affirm the trial court's order only if no substantial evidence supports the verdict. (*Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1510 [65 Cal.Rptr.2d 266].)

[17]All statutory references in part IV are to the Government Code unless otherwise specified.

maintained for use as a flying model airplane field was in close proximity to privately owned high power electrical lines. The court held the city could be liable for a dangerous condition on its property even though the danger was created only because of the presence of privately owned property. (*Id.* at pp. 73-75.) These cases establish that a public entity is liable for a dangerous condition on property it owns even though the danger would not exist but for the presence of privately owned equipment on or adjacent to the public property.[18]

City alternatively contends that, even if it had title to the stage and the openings created by the trapdoors, bare title without the control of the property is inadequate as a matter of law to impose liability for dangerous conditions on public property, citing *Low v. City of Sacramento* (1970) 7 Cal.App.3d 826 [87 Cal.Rptr. 173]. From this legal premise, City argues there is no evidence it controlled the City-owned property at the time of Huffman's injury (*Tolan v. State of California ex rel Dept. of Transportation* (1979) 100 Cal.App.3d 980, 983 [161 Cal.Rptr. 307]); Hamlin, although a City employee, neither acted as City's employee nor was under City's control when he performed his tasks for AAF; instead, Hamlin had been loaned to and was under the control of AAF when he performed his tasks.

We reject both the legal premise and the factual contention underlying City's argument. First, City's legal premise is flawed because *Low* did not hold that a public entity that owns property containing a dangerous condition escapes liability absent proof it also controlled the property. The section 830, subdivision (c) statutory language interpreted by *Low* defines public property as "property owned or controlled by the public entity." The language is disjunctive rather than conjunctive, and therefore public property is property owned by the entity without the requirement of control. *Low* did not hold that property owned by a public entity forfeits its public property status if the public entity ceded temporary control over the property to third parties; instead, *Low*'s discussion of the relevance of control was limited to those cases where "the public entity's relationship to the dangerous property is not

---

[18]We are unconvinced by City's effort to distinguish *Chavez* and *Branzel.* City argues the risk of injury in those cases was to persons on public property. However, argues City, the only risk here was from falling through an open trapdoor, and to fall through the trapdoor it was necessary for Huffman to leave public property (the stage) and enter private property (the open trapdoor). However, the only privately owned property involved here is the steel structure and mechanism attached to the stage. City cites no authority suggesting the stage to which the structure was attached, or the airspace through which Huffman fell, ceased being City-owned property after the structure and mechanism were appended to the stage.

clear."[19] (*Low v. City of Sacramento, supra,* 7 Cal.App.3d at p. 833.) There is no lack of clarity here. City owned the Center and therefore *Low*'s *control* analysis is not applicable.

Second, even assuming City's control of the property is required to impose liability, there is substantial evidence City retained sufficient control over the stage to hold City liable for the dangerous condition of the stage. Under *Low,* control exists if the public entity has the "power to prevent, remedy or guard against the dangerous condition." (*Low v. City of Sacramento, supra,* 7 Cal.App.3d at pp. 833-834.) Hamlin had the power to prevent, remedy or guard against the dangerous condition; it was his responsibility, as technical director, to supervise installation and operation of the trapdoors. Although Hamlin may not have had authority to implement all of the safety features that Huffman's expert claimed were appropriate, including using a spotter or conducting the initial rehearsals with the trapdoors closed, a jury could infer that Hamlin did have authority to install some of the safety features, including Glo-Tape or understage lighting, that would have remedied or guarded against the dangerous condition.

City argues it had no control over Hamlin because he was not City's employee while working as the technical director for the play's production; instead, Hamlin was AAF's employee and his services were supplied to the production to fulfill AAF's contractual obligations. Although Hamlin was loaned to AAF by City for a limited time and purpose, the evidence permits the inference he remained City's employee while acting as technical director. ■ In cases involving borrowed employees, the courts have applied respondeat superior principles to hold the lending employer liable for the negligence of the borrowed employee unless the lending employer has relinquished all right of control over the borrowed employee's activity and thereby created a special employment relationship between the employee and the borrowing employer. (*Marsh v. Tilley Steel Co.* (1980) 26 Cal.3d 486, 492-495 [162 Cal.Rptr. 320, 606 P.2d 355].) Whether a special employment relationship exists that absolves the lending employer from respondeat superior liability is ordinarily a question of fact. (*Ibid.*) *Marsh* explained at pages 492-493 that "evidence of the following circumstances tends to negate the existence of a special employment: The employee is (1)

---

[19]Specifically, *Low* involved an injury that occurred on a strip of land owned in fee title by a county but was subject to a street easement owned by a city. Because section 830, subdivision (c) stated that public property included land owned by the entity but did not include "easements . . . that are located on the property of the public entity but are not owned or controlled by the public entity," the easement exception would have exempted the county from dangerous condition liability unless the county owned or controlled the easement. It was in the context of whether or not the county could take advantage of the easement exception that *Low* concluded an analysis of *control* was necessary.

not paid by and cannot be discharged by the borrower, (2) a skilled worker with substantial control over operational details, (3) not engaged in the borrower's usual business, (4) employed for only a brief period of time, and (5) using tools and equipment furnished by the lending employer." The evidence here, viewed most favorably to the verdict, was that Hamlin was paid by City, not by AAF, and his hours of work were set by City; City's manager conducted Hamlin's performance reviews and had the authority to fire him; Hamlin was a supervisory employee for City whose job included working as technical director at the Center; and Hamlin had "fairly broad" authority or discretion in matters within his role as technical director. Because the evidence permits the inference that City retained some control over Hamlin while he was on loan to AAF, substantial evidence supports the conclusion that City through Hamlin retained control of the property notwithstanding Hamlin's temporary assignment to AAF.

B.  *There Is Substantial Evidence the Property Had a Dangerous Condition*

City contends that even if it owned or controlled the property there was no dangerous condition on the property. A condition is dangerous if it creates a substantial risk of injury when foreseeable users use the property with due care. (§ 830, subd. (a).) A condition is not dangerous if the risk of injury created by the condition is so minor, trivial or insignificant that it arises only when foreseeable users do not use due care. (§ 830.2; *Fredette v. City of Long Beach* (1986) 187 Cal.App.3d 122, 131 [231 Cal.Rptr. 598].)

The jury was properly instructed on the statutory standards for a dangerous condition and by its verdict necessarily found the condition of the stage and trapdoors posed a substantial risk of injury to foreseeable users exercising due care. Whether a given set of facts and circumstances creates a dangerous condition is usually a question of fact. (*Peterson v. San Francisco Community College Dist.* (1984) 36 Cal.3d 799, 810 [205 Cal.Rptr. 842, 685 P.2d 1193].) The issue of a dangerous condition becomes a question of law only where reasonable minds can come to only one conclusion. (*Turner v. State of California* (1991) 232 Cal.App.3d 883, 892 [284 Cal.Rptr. 349].) City argues we should affirm the trial court's order granting judgment notwithstanding the verdict because, on the facts and circumstances here, the only conclusion that reasonable minds could reach is that there was no substantial risk of injury if foreseeable users used due care while rehearsing on the stage.

City's argument is that the open trapdoors did not pose a substantial risk that performers using due care might fall through the floor opening. The

performers were aware the doors had been reconfigured, had familiarized themselves with the new locations, and knew the doors were to be open during the rehearsal. City contends that because the overhead lighting provided adequate visibility for rehearsal purposes, and the warning mechanisms, including a spotter, Glo-Tape or understage lighting, would have added nothing to the performers' knowledge of the locations of the open trapdoors, the only substantial risk of injury arose if the performers did not use due care on the stage.

■ Whether the condition of property posed a substantial risk of injury to foreseeable users exercising due care is an objective standard and is measured by the risk posed to an ordinary foreseeable user. (*Schonfeldt v. State of California* (1998) 61 Cal.App.4th 1462, 1466 [72 Cal.Rptr.2d 464].) Accordingly, where the condition of property posed a substantial risk of injury to the ordinary foreseeable user exercising due care, the fact the particular plaintiff may not have used due care is relevant only to his comparative fault and not to the issue of the presence of a dangerous condition. (*Fredette v. City of Long Beach, supra,* 187 Cal.App.3d 122, 130-131.)

■ We conclude reasonable minds could differ on the issue of whether the condition of the stage posed a substantial risk of injury to the foreseeable user exercising due care. City does not dispute that openings in the stage apron posed some risk to performers and argues only that the risk was insignificant because the performers knew the dangers were present somewhere on the stage apron and could with due care have observed those dangers and avoided them. (*Fredette v. City of Long Beach, supra,* 187 Cal.App.3d at pp. 130-132 [no duty to warn against diving from pier where dangers posed by shallow water around pier obvious to anyone using pier].) However, a trier of fact could conclude the dark color of the stage apron did not contrast with the dark color of the openings (caused by the absence of understage lighting) and the boundaries of the danger zone were obscured; a performer using due care would not be alerted to the danger zone. Glo-Tape would have demarcated the boundaries of the danger zone, and its absence similarly could prevent a careful performer from noticing the danger.[20] Finally, there was evidence the use of spotters and Glo-Tape was customary

---

[20]An unstated premise of City's argument is that because the performers were on notice of the open doors and danger, due care required the performers to be focused on the locations of the holes posing the threat to their safety. However, a trier of fact could conclude that a reasonable performer was subjected to competing demands on his attention: he was present to rechoreograph existing blocking, he had to become acclimated to the impact that a new set of stage apron dimensions had on his preexisting choreography, and he was listening to the director and interacting with fellow performers. A trier of fact could weigh these competing demands on a reasonable performer's attention in assessing whether a performer using due

in the industry and had been used by this troupe in prior rehearsals and performances at the Lyceum to alert performers to their proximity to the open trapdoors.[21] A jury could infer these alerting mechanisms are employed because even when ordinary performers exercising due care are aware of the location and dangers posed by the open trapdoors, they nevertheless need additional warning systems, considering the conflicting demands on their attention.

We conclude reasonable minds can differ over whether, under the totality of the circumstances, the condition of the stage created a substantial risk of injury to the ordinary foreseeable user exercising due care, and therefore whether there was a dangerous condition on City's property.

C. *The Trial Court Correctly Rejected City's Primary Assumption of the Risk Argument*

City's motion for judgment notwithstanding the verdict argued Huffman was barred from recovery under the primary assumption of risk doctrine. The trial court rejected this argument because it concluded City's acts and omissions increased the risks of injury to Huffman. ■ City argues primary assumption of risk involves the determination of whether the defendant owed the plaintiff any duty of care (*Staten v. Superior Court* (1996) 45 Cal.App.4th 1628, 1632-1633 [53 Cal.Rptr.2d 657]) and the existence of a duty of care is a legal question that we may review de novo (*Delgado v. American Multi-Cinema, Inc.* (1999) 72 Cal.App.4th 1403, 1406 [85 Cal.Rptr.2d 838]).

In *Knight v. Jewett* (1992) 3 Cal.4th 296 [11 Cal.Rptr.2d 2, 834 P.2d 696], the court addressed the assumption of risk doctrine in negligence cases in the context of California's comparative fault principles adopted in *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804 [119 Cal.Rptr. 858, 532 P.2d 1226, 78 A.L.R.3d 393]. *Knight* delineated two categories of assumption of risk cases: primary and secondary assumption of risk. Primary assumption of risk "embodies a legal conclusion that there is 'no duty' on the part of the defendant to protect the plaintiff from a particular risk." (*Knight v. Jewett, supra*, 3 Cal.4th 296, 308.) In primary assumption of risk cases, there is no duty of care owed and the plaintiff's assumption of risk acts as a complete bar to the plaintiff's cause of action. (*Ibid.*) Secondary assumption of risk, in contrast, refers to those instances in which the defendant owes a duty of care

---

care would have been able to focus a substantial amount of his attention on locating openings obscured by the absence of highlighting mechanisms.

[21]Other witnesses disputed that spotters were used at the Lyceum, but this is a factual question that we presume was resolved in favor of Huffman.

to the plaintiff and breaches that duty, and the plaintiff knowingly encounters a risk created by the breach of the duty. (*Id.* at p. 310.) Secondary assumption of risk is subsumed into the comparative fault scheme and a plaintiff's assumption of that risk does not act as a bar to the action. (*Id.* at p. 315.)

*Knight*, although addressing the assumption of the risk doctrine in the recreational sports setting, provided an analytical framework for evaluating assumption of risk in other contexts.[22] This analysis "depends heavily on the nature of the [activity] itself" as well as "on the defendant's role in, or relationship to, the [activity]." (*Knight v. Jewett, supra,* 3 Cal.4th at pp. 316-317.) Primary assumption of risk applies only when a court, after examining the nature of the particular activity and the parties' relationship to that activity, concludes that a plaintiff engaged in the particular activity is harmed by the risks inherent in the activity. (*Herrle v. Estate of Marshall, supra,* 45 Cal.App.4th at p. 1765.) The conclusion that a particular activity necessarily encompasses risks inherent in the nature of the activity means that the defendant has no duty to protect the plaintiff from those risks (*Staten v. Superior Court, supra,* 45 Cal.App.4th 1628, 1632) or to take steps to reduce those risks (*Connelly v. Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8, 12-14 [45 Cal.Rptr.2d 855]).

Although a defendant may have no duty to protect the plaintiff from risks inherent in certain activities, the defendant does have a duty not to increase the inherent risks of those activities. (*Bush v. Parents Without Partners* (1993) 17 Cal.App.4th 322, 327-330 [21 Cal.Rptr.2d 178] [even though dancing involves inherent risk of falling, defendant can be liable for adding substance to floor that made it too slippery because defendant's action increased risk of falling].) For example, although an inherent risk of racing bicycles over a motocross course is the risk of falling when going over jumps, primary assumption of risk would not bar recovery by a rider if the design of some jumps increased the risks of falling. (*Branco v. Kearny Moto Park, Inc.* (1995) 37 Cal.App.4th 184, 191-193 [43 Cal.Rptr.2d 392]; see also *Morgan v. Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127 [40 Cal.Rptr.2d 249] [although risk of being struck by errant golf shots is

---

[22]The courts have applied primary assumption of risk principles to activities other than sporting or recreational endeavors, including injuries in the workplace. (See *Milwaukee Electric Tool Corp. v. Superior Court* (1993) 15 Cal.App.4th 547, 559-565 [19 Cal.Rptr.2d 24] [primary assumption of risk did not bar worker from suit against toolmaker for injuries caused by tool]; *Cohen v. McIntyre* (1993) 16 Cal.App.4th 650, 655-656 [20 Cal.Rptr.2d 143] [primary assumption of risk barred veterinarian from recovering from owner of dog for dog bite injury]; *Herrle v. Estate of Marshall* (1996) 45 Cal.App.4th 1761, 1765-1771 [53 Cal.Rptr.2d 713] [nurse's aide at convalescent hospital assaulted by senile patient; primary assumption of risk barred recovery].)

inherent in sport, golf course operator can be liable where design of course increases risk of being hit by an errant shot].)

■ City's primary assumption of risk argument asserts that when a play employs open trapdoors on the stage, the activity involves an inherent risk of falling through those door openings, and Huffman as a participant in the play assumed that risk. City then contends it did nothing to increase the risks inherent in rehearsing the play with open trapdoors. Accordingly, argues City, primary assumption of risk bars Huffman's claim against City.

The trial court rejected City's primary assumption of risk claim because it found City's acts or omissions increased the risks beyond those inherent in using an open trapdoor on a stage apron.[23] We conclude substantial evidence supports that finding. The evidence showed that properly marked trapdoors were safe to use. The evidence also permitted an inference that the performers had numerous demands on their attention: the chaotic nature of the Phobia scene, the changed configuration of the stage apron that constricted the space within which the actors were performing, and the need to pay attention to the director and the other actors while moving about the stage. Furthermore, there was evidence that actors customarily rely on subtle visual clues to orient themselves when moving about a stage and that the perimeters of trapdoors are generally marked by Glo-Tape. This evidence permits an inference that the absence of highlighting mechanisms (Glo-Tape or understage lighting) or warning devices (spotters) substantially increased the risk of injury because a performer would have greater difficulty using his peripheral vision to observe a hazard whose boundaries were not marked.[24]

We conclude the trial court correctly rejected City's primary assumption of risk claim.

---

[23]City cites *Staten v. Superior Court, supra,* 45 Cal.App.4th 1628 to argue the trial court erroneously relied on Schreiber's expert opinion to reach its conclusion that City's acts or omissions increased the risks beyond those risks inherent in the use of an open trapdoor. *Staten* noted that because *Knight* held duty was a legal question and turned on the question of inherent risks, and other cases held experts may not testify on matters that are legal questions, it was debatable whether an expert could testify on the risks inherent in a particular activity. (*Id.* at pp. 1635-1636.) However, *Staten* also noted that several cases assumed without discussion that, after the court decides the inherent risks without the aid of experts, the court could consider expert testimony in its second step of deciding whether a defendant's conduct increased the risks. (*Ibid.*) The trial court considered Schreiber's evidence on this latter question, and we perceive no reason to preclude a trial court from receiving expert testimony on the customary practices in an arena of esoteric activity for purposes of weighing whether the inherent risks of the activity were increased by the defendant's conduct.

[24]City argues that the absence of Glo-Tape or understage lighting does not preclude primary assumption of risk because there was no causal connection between the accident and these omitted safety features. (*Freeman v. Hale* (1994) 30 Cal.App.4th 1388, 1396, fn. 4 [36 Cal.Rptr.2d 418].) City argues that the lighting used during the rehearsal was similar to courtroom lighting, providing ample illumination for the actors to detect the open trapdoors, and Glo-Tape would have added nothing under those lighting conditions. City argues in effect

## DISPOSITION

The judgments are reversed. Huffman is entitled to costs on appeal.

Kremer, P. J., and Benke, J., concurred.

A petition for a rehearing was denied December 13, 2000.

---

that because Huffman could have located the trapdoors had he been paying attention, but his eyes were focused elsewhere in the moment before his fall, the absence of Glo-Tape or understage lighting had no causal nexus to the fall. However, the presence or absence of a proximate causal relationship between the defendant's omission and the accident is a classic factual issue. (*DiRosa v. Showa Denko K.K.* (1996) 44 Cal.App.4th 799, 805-806 [52 Cal.Rptr.2d 128].) By way of example only, even were Huffman facing away from the trapdoor, a jury could infer that the presence of understage lighting would have alerted Huffman to the trapdoor because as he approached it the understage lighting would have caused Huffman to cast a shadow into his field of vision.