[No. C020613. Third Dist. May 10, 1996.]

JAMES FORTIER, Plaintiff and Appellant, v.
LOS RIOS COMMUNITY COLLEGE DISTRICT et al., Defendants and
Respondents.

COUNSEL

Aran & Meyer, Jeffrey L. Aran and Gregory A. Meyer for Plaintiff and Appellant.

Johnson, Schachter, Lewis & Collins, Alesa M. Schachter and George W. Holt for Defendants and Respondents.

OPINION

PUGLIA, P. J.—Plaintiff James Fortier appeals from a judgment of dismissal following the granting of summary judgment in favor of Los Rios Community College District and one of its constituent institutions, American River College (defendants). Plaintiff seeks damages for injuries suffered when he collided with another player during a football practice drill. The trial court concluded plaintiff's negligence claim is barred by the doctrine of primary assumption of the risk.

As we explain, defendants owed plaintiff a duty not to increase the dangers inherent in the sport of football. In granting summary judgment, the trial court found uncontradicted evidence that plaintiff's injury resulted from a risk inherent in the sport of football, thus obviating the possibility any increase by defendants in inherent risks could have been a causative factor. We agree and shall affirm the judgment of dismissal.

Plaintiff, along with 50-60 other students, enrolled in an "advanced football" class at American River College (ARC) in the summer of 1993. The instructors were ARC head football coach Larry Ghilardi and his assistant coaches. According to the course syllabus, the objectives of the course were to develop an appreciation for football, perform advanced offensive and defensive techniques, and apply appropriate football strategy. Classes were held four days a week for two to three hours.

Required equipment included gym clothes and gym shoes. Helmets and pads were neither required nor provided because the on-field practice drills were "non-contact" drills, i.e., no tackling was permitted.

The on-field drills involved a variety of exercises, including a "seven-on-seven" drill. The seven-on-seven drill is widely used in high school and college. Seven offensive players (quarterback, receivers, and running backs) practice against seven defensive players (cornerbacks, safeties and linebackers). Offensive and defensive linemen do not participate.

In a seven-on-seven drill the offensive players run pass plays and the defensive players attempt to defense such plays. The play ends when a pass is incomplete or intercepted or the receiver to whom a pass is completed is touched by a defensive player.

Like the other drills performed by the students, the seven-on-seven drill is designated a noncontact exercise. There is no intentional, aggressive contact and no tackling.

Plaintiff was injured while participating in a seven-on-seven drill. Playing wide receiver, plaintiff was running up the field, his eyes following a ball in flight which had been passed to him. Ricky Ford, another student who was playing free safety, collided with plaintiff as they both reached for the ball. Ford's left elbow made contact with plaintiff's face. Plaintiff suffered severe injuries, including an orbital fracture to his left eye socket which required surgery.

Plaintiff concedes Ford never intended to hit him or make contact with or tackle him. Ford was simply trying to intercept the ball when the collision occurred.

Plaintiff's complaint alleges negligent supervision and instruction. Defendants obtained summary judgment, relying on primary assumption of the risk.

█ " 'The purpose of a summary judgment proceeding is to permit a party to show that material factual claims arising from the pleadings need not be tried because they are not in dispute.' . . . 'The function of the pleadings in a motion for summary judgment is to delimit the scope of the issues: the function of the affidavits or declarations is to disclose whether there is any triable issue of fact within the issues delimited by the pleadings.' " (*FPI Development, Inc.* v. *Nakashima* (1991) 231 Cal.App.3d 367, 381 [282 Cal.Rptr. 508], citations omitted.) A motion for summary judgment will be granted if the moving papers establish there is no triable issue

of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

In their summary judgment motion, defendants argued the injuries suffered by plaintiff are inherent in the sport of football and thus plaintiff's claim is barred by primary assumption of the risk. We agree.

"[T]here are two types of assumption of risk: primary and secondary." (*Yancey* v. *Superior Court* (1994) 28 Cal.App.4th 558, 562 [33 Cal.Rptr.2d 777].) Primary assumption of the risk occurs when a party voluntarily participates in a sporting event or activity involving inherent risk. (*Knight* v. *Jewett* (1992) 3 Cal.4th 296, 314-316 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*).) Primary assumption of the risk is a complete bar to recovery. It is another way of saying no duty of care is owed for risks inherent in a given sport or activity. (*Ferrari* v. *Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 253 [38 Cal.Rptr.2d 65] (*Ferrari*); see *Knight, supra,* 3 Cal.4th at pp. 314-316; see also *Murphy* v. *Steeplechase Amusement Co.* (1929) 250 N.Y. 479 [176 N.E. 173, 174] ["The timorous may stay at home."].)

"Secondary assumption of risk is the traditional variety where a defendant breaches a duty of care owed to the plaintiff but the plaintiff nevertheless knowingly encounters the risk created by the breach. Secondary assumption of risk is not a bar to recovery, but requires the application of comparative fault principles." (*Wattenbarger* v. *Cincinnati Reds, Inc.* (1994) 28 Cal.App.4th 746, 751 [33 Cal.Rptr.2d 732] (*Wattenbarger*); see *Knight, supra,* 3 Cal.4th at pp. 314-415.)

In *Knight,* the plaintiff was participating in a game of touch football when defendant, an overzealous player, knocked plaintiff down and stepped on her hand, injuring her. (3 Cal.4th at pp. 300-301.) The reviewing court concluded defendant owed no duty to the injured plaintiff: "[I]n the heat of an active sporting event like baseball or football, a participant's normal energetic conduct often includes accidentally careless behavior. . . . [E]ven when a participant's conduct violates a rule of the game and may subject the violator to internal sanctions prescribed by the sport itself, imposition of *legal liability* for such conduct might well alter fundamentally the nature of the sport by deterring participants from vigorously engaging in activity that falls close to, but on the permissible side of, a prescribed rule." (*Id.,* at pp. 318-319, italics in original.)

*Ford* v. *Gouin* (1992) 3 Cal.4th 339 [11 Cal.Rptr.2d 30, 834 P.2d 724, 34 A.L.R.5th 769] (*Ford*), a companion case to *Knight,* held the driver of a boat

owed no duty to a skier who was injured when his head struck a limb extending over the water. Rejecting the plaintiff's argument primary assumption of the risk should not apply to a cooperative activity such as waterskiing, the court explained: "Even when a water-skier is not involved in a 'competitive' event, the skier has undertaken vigorous, athletic activity, and the ski boat driver operates the boat in a manner that is consistent with, and enhances, the excitement and challenge of the active conduct of the sport. Imposition of legal liability on a ski boat driver for ordinary negligence in making too sharp a turn, for example, or in pulling the skier too rapidly or too slowly, likely would have the same kind of undesirable chilling effect on the driver's conduct that the courts in other cases feared would inhibit ordinary conduct in various sports." (*Id.*, at p. 345.)

In *Knight*, the court noted ". . . the scope of the legal duty owed by a defendant frequently will . . . depend on the defendant's role in, or relationship to, the sport." (*Knight, supra*, 3 Cal.4th at p. 317.) Seizing upon this statement, plaintiff argues that unlike a coparticipant, an instructor *always* owes a duty of care to his students. Citing *Galardi* v. *Seahorse Riding Club* (1993) 16 Cal.App.4th 817 [20 Cal.Rptr.2d 270] (*Galardi*) and *Tan* v. *Goddard* (1993) 13 Cal.App.4th 1528 [17 Cal.Rptr.2d 89] (*Tan*), plaintiff suggests that where the action is initiated against an instructor on a claim of negligent supervision or instruction, the doctrine of primary assumption of the risk is not applicable. Rather, the issue is one of secondary assumption of the risk, entitling plaintiff to a trial on the merits.

Instructors, like commercial operators of recreational activities, "have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport. Thus, although a ski resort has no duty to remove moguls from a ski run, it clearly does have a duty to use due care to maintain its towropes in a safe, working condition so as not to expose skiers to an increased risk of harm. The cases establish that the latter type of risk, posed by a ski resort's negligence, clearly is not a risk (inherent in the sport) that is assumed by a participant." (*Knight, supra*, 3 Cal.4th at p. 316; accord, *Ferrari, supra*, 32 Cal.App.4th 248, 254 [commercial operator of rafting trip owed plaintiff duty not to increase the risks inherent in the sport of white water rafting].)

Plaintiff's reliance on *Galardi* and *Tan* is misplaced. In both cases an instructor acted in such a way as to increase the risk of harm inherent in the sport. In *Galardi*, the instructor directed his student to jump her horse over fences which were unreasonably and unnecessarily high and improperly designed, located and spaced. (16 Cal.App.4th at p. 819); in *Tan*, the injured

jockey was directed to ride a lame horse in the wrong direction on a track that was itself unsafe. (13 Cal.App.4th at p. 1531.) *Galardi* and *Tan* stand for the proposition that when an instructor acts so as to increase the risk of harm inherent in a particular sport, the instructor may not thereafter rely on primary assumption of the risk.

*Wattenbarger, supra*, a recent decision of this court, illustrates the same principle. There, the plaintiff, a 17-year-old baseball player, injured his arm while trying out as a pitcher for a major league team. Plaintiff's complaint alleged defendants negligently permitted him to throw a fourth pitch after he had thrown three pitches and then informed defendants his arm had "popped." Defendant obtained summary judgment and we reversed. We noted that while an arm injury is a risk inherent in the sport of baseball, "[i]t is reasonable to infer that when plaintiff . . . informed the [team's] personnel his arm had 'popped,' he was seeking guidance as to how to proceed. . . . [¶] . . . [¶] . . . [D]efendants were not coparticipants in the [tryout,] but were instead in control of it[,] . . . and took it upon themselves to restrict the participation of players with injuries." (*Wattenbarger, supra*, 28 Cal.App.4th at pp. 753-755, fn. omitted.) Significantly, we observed: "Had plaintiff stopped after his third pitch of the simulated game, we would have no difficulty finding primary assumption of risk a bar to recovery. Up to that point, defendants did nothing more than provide an opportunity for plaintiff to do what he had been doing for the last two years i.e., to pitch. Whatever injury occurred on the third pitch was an inherent risk of the pitcher's unremitting contest with the batter." (*Id.*, at p. 753.)

Plaintiff argues defendants breached their duty not to increase the risk inherent in the sport of football in three ways: (1) by encouraging class participants to be "aggressive" in the on-field drills, (2) by misleading participants into believing the on-field exercises would be noncontact drills, and (3) by failing to inform offensive players that defensive players would try to intercept passes.

Plaintiff notes that defendants encouraged defensive players to be aggressive and to intercept passes and awarded defensive teams points for interceptions. Plaintiff argues defendants thereby increased the risk of injury by setting in motion an inevitable collision between offensive and defensive players.

To encourage aggressive play in football is simply to encourage the participants to play the game as it should be played. Football is a sport which is characterized by aggressive play. Wide receivers run pass patterns and

attempt to catch footballs passed to them. Defensive backs react, attempting to cover the receivers and knock down or intercept the passes intended for the receivers. Neither the game of football nor the particular exercise in which plaintiff was injured, which is an integral part of the game, can be authentically performed if the participants are not carrying out their respective roles aggressively.

Plaintiff argues defensive players should have been instructed to run away from a pass in flight to avoid contact with offensive players. In *every* game of football, touch, flag, or tackle, the object is for the offense to move the ball down the field by running or passing it, and for the defense to stop or impede the progress of the offense. It is a universally accepted defensive tactic to knock down or intercept passes thrown to offensive players. If instead defensive players were to run away from intended receivers in order to avoid contact, as plaintiff proposes, it would fundamentally alter the game of football as it is played at all levels of competition, and would run contrary to the Supreme Court's dictum that the "overriding consideration in the application of primary assumption of risk is to avoid imposing a duty which might chill vigorous participation in the implicated activity and thereby alter its fundamental nature." (*Ferrari, supra,* 32 Cal.App.3d at p. 253; see *Knight, supra,* 3 Cal.4th at pp. 318-319.)

A major objective of the class was to increase the skill level of participants. Yet a wide receiver's ability to run precise pass patterns would be little enhanced if practiced against a nonexistent defense. And defensive players would not increase their skill in defending against the pass by running away from rather than toward a passed ball. Moreover, such rules of engagement would deprive instructors of the meaningful opportunity to judge the physical abilities, talents and progress of the players in the class.

Nor does the fact defendants awarded points for intercepted passes change the analysis. Keeping score is an accepted method in sports of enhancing competition and encouraging the participants to their best efforts. We fail to discern how awarding points for interceptions increased the risks *inherent* in the game of football. No matter the level of play, those risks always include accidental collisions between offensive and defensive players vying for possession of a passed football.

There is no merit in plaintiff's claim he was misled into believing there was to be no contact whatsoever in the seven-on-seven drill. Plaintiff asserts "non-contact" means no touching. But in the context of the game of football, it clearly does not. Whether in the seven-on-seven drill, or even a game such

as touch or flag football, "non-contact" means no tackling. It is not and in the nature of the sport cannot be a guarantee of absolutely no contact. In his deposition plaintiff indicates he was well aware the noncontact drills involved a certain level of incidental and, in fact, deliberate contact, e.g., the touching of an offensive player by a defensive player to end a play. Plaintiff had also observed players bump into each other while performing the drill. In short, a certain amount of contact is part of the drill.

Finally, plaintiff asserts he was not informed during class that in the seven-on-seven drill defensive players would attempt to intercept passes thrown to receivers. Testimony by plaintiff at his deposition belies this assertion. Plaintiff testified a play in the seven-on-seven drill ended whenever a defensive player touched a receiver who caught a pass *or* when a *defensive player intercepted the football.*[1] Plaintiff's declaration also belies this assertion: "The instructors set up point systems for these drills in which the offense would be awarded points for scoring a touchdown *and the defense would be awarded points for interceptions.*" (Italics added.)

Plaintiff's evidence in opposition to summary judgment also belies this assertion. Plaintiff provided declarations from two other class members who were on the field at the time of plaintiff's injury. Both declare that as an integral part of the seven-on-seven drill defensive players would attempt to intercept passes thrown to the receivers.

Prior to his injury plaintiff had participated in approximately 20 class workouts in which the seven-on-seven drill was conducted. Moreover, plaintiff was an experienced high school football player, having played four years of high school football. During that time, plaintiff participated in countless seven-on-seven drills. There is nothing in the record to suggest the seven-on-seven drills conducted in high school differed in any manner from those conducted in plaintiff's course at ARC.

Plaintiff makes the additional claim defendants should have provided him with a helmet for the on-field drills. According to plaintiff, "common sense" dictates that players participating in a drill such as the seven-on-seven drill be given a helmet to protect them from the type of injuries he suffered.

Plaintiff's claim fails for several reasons. Although the record contains no such evidence, we shall assume a helmet would have protected plaintiff from

---

[1]At another point at his deposition plaintiff was asked: "[W]ould you . . . agree that during the 7 on 7 drills the object of the offense is to get the ball and make a touchdown; and the object of the defense is to intercept the ball and try and avoid a touchdown [?]" Plaintiff answered, "Yes."

the type of injuries he suffered. However, there is no evidence that a helmet would protect the players from other types of injuries they might suffer in a similar collision.

More significantly, there is evidence in the record that wearing a helmet might actually increase the risk of injury. In his declaration in support of summary judgment, Ghilardi states: "It would not be safe to wear helmets and pads for pre-season practice. The players are generally not ready for contact football at this point because of a lack of physical conditioning. . . . Helmets and pads protect against physical contact. By allowing players to use helmets and pads, even during non-contact drills, it can encourage players to tackle or make other intentional contact. Pre-season, non-contact drills without pads and helmets increase[] safety."

Aside from Ghilardi's uncontradicted declaration, common sense indicates the wearing of helmets could increase the number and severity of injuries to other, unprotected parts of the body. For example, in plaintiff's collision with Ford his helmeted head could have struck Ford in a vulnerable part of his body. Thus, the use of helmets alone without the complete array of protective gear, e.g., shoulder pads, hip pads, thigh pads, knee pads, etc., would create as least as many risks as it interdicted. Considering that this was an accidental collision in a football practice drill that involved no tackling or intentional, aggressive contact, we conclude that the failure of defendants to provide plaintiff with a helmet did not increase the risks inherent in the activity he voluntarily participated in. Moreover, were we to hold defendants liable for failure to provide helmets, the effect would be to alter fundamentally the nature of the recreational sport of football as played and enjoyed by thousands. The seven-on-seven drill is akin to one-hand or two-hand touch, or flag football, all of which are variations of the sport in which tackling or aggressive, intentional contact is not permitted. There is in fact little difference between the drill in which plaintiff was participating and a supervised game of touch or flag football engaged in by students in the schoolyard or on the playground. Typically participants in such games do not wear helmets or, for that matter, other protective equipment. To impose the duty to provide such equipment on schools and other supervisors and organizers of such sport in order to avoid liability for injuries inherent in the rough and tumble of such activity would have enormous social and economic consequences. (See *Rowland* v. *Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561, 32 A.L.R.3d 496] [one important consideration relevant to duty requires an evaluation of the consequences to the community of imposing a duty to exercise care with resulting liability for breach].) The opportunities to participate in organized, recreational football would be significantly diminished.

Plaintiff's injuries were the result of his voluntary participation in a sport in which the risk of injury due to accidental collision is known, acknowledged and accepted. Plaintiff's injuries could have occurred in the most benign forms of football, i.e., touch or flag (see *Knight, supra,* 3 Cal.4th at pp. 300-301 [plaintiff injured as a result of a collision occurring during a coed game of touch football]), or even in other sports considered to be non-contact e.g. baseball (collision of two defensive players trying to catch a fly ball) or basketball (collision between offensive and defensive rebounders or between offensive player driving for the basket and defender). (See *id.,* at pp. 316-320.)[2]

The decisive issue here is whether the collision in which plaintiff was injured is an inherent risk in the sport in which he was participating. Since it clearly is, the possibility that plaintiff's injury resulted from an increase by defendants in the inherent risks is necessarily excluded.

The judgment is affirmed. Defendants shall recover their costs on appeal.

Davis, J., and Nicholson, J., concurred.

---

[2]All so-called "non-contact" team sports which require the rapid and sudden movement of the players in the playing arena involve an inherent risk of contact and resulting injury. In fact, the same could happen in a friendly game of racquetball between two contestants. Indeed, incidental or accidental contact can occur even in the most paradigmatic of noncontact sports such as long-distance running, a fact to which Jim Ryun and Mary Decker Slaney could readily attest.