[No. C038642. Third Dist. Feb. 20, 2002.]

BRANDON WEST, a Minor, etc., et al., Plaintiffs and Appellants, v. SUNDOWN LITTLE LEAGUE OF STOCKTON, INC., et al., Defendants and Respondents.

352

**COUNSEL**

Law Offices of Anthony J. Gutierrez, Anthony J. Gutierrez; Law Office of Bryce C. Anderson and Bryce C. Anderson for Plaintiffs and Appellants.

Borton, Petrini & Conron and Marc C. Gessford for Defendants and Respondents.

**OPINION**

**NICHOLSON, J.**—Ten-year-old Brandon West was warming up with a few of his teammates in the outfield before a Little League game. His coach threw him a pop fly. West lost the ball in the setting sun. It hit him in the eye and caused serious injury. West appeals from the judgment dismissing his complaint against defendants Sundown Little League of Stockton, Inc., Little League Baseball, Inc., Dennis Hughes, Ed Krager, and Bob Whitaker. West contends the trial court "erred in finding that as a matter of law the defense of primary assumption of risk applied to the particular conduct and defendants in question, and that defendants had not waived the defense in writing at the time that [West] was first enrolled in Little League." Losing a fly ball in the sun and being hit by it is an inherent risk of baseball assumed by all players whether it happens during little league warm-ups or during Game 7 of the Major League World Series. The written release does not present a material question of fact concerning waiver. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

In the spring of 1997, plaintiff and appellant Brandon West was 10 years old. He was playing his first year on a Little League[1] organized "hardball" baseball team, although he had previously played "softball" baseball in a

---

[1] "Little League Baseball is a Federal Incorporation granted under a Bill signed into law by President Lyndon B. Johnson on July 17, 1964, and amended December 24, 1974, to admit

physical education class and with his friends. West's team was a Minor A team—the second step up after T-Ball[2] in his league. While the minor league[3] is "instructional," there is still a "certain amount of competitiveness inherent to the game itself."

West claimed he could play baseball as well as any of the other players on his team. Prior to the day he was injured, West had participated in numerous practices, played in two practice games and played in several official games. Normally, plaintiff played pitcher or at first base.

When she signed him up to play Little League baseball, West's mother, Patricia West, completed and signed the Little League application. One paragraph of that application stated: "I/We know that participation in baseball or softball may result in serious injuries and protective equipment does not prevent all injuries to players, and do hereby waive, release, absolve, indemnify and agree to hold harmless the local Little League, Little League Baseball Incorporated, the organizers, sponsors, supervisors, participants and persons transporting my/our child to and from activities for any claim arising out of any injury to my/our child whether the result of negligence or for any

girls. [¶] The legislation . . . received unanimous approval of both the U.S. Senate and the House of Representatives . . . ." (<http://www.Littleleague.org/about/structure.htm> [as of Feb. 20, 2002].) "While approximately 3,000,000 children in countries all around the globe enjoy playing Little League, there are fewer than 100 employees of Little League in the world. The Little League program is provided on the local level by adult volunteers from within the community." (<http://www.Littleleleague.org/divisions/index.htm> [as of Feb. 20, 2002].) In the Sundown Little League, there are four levels of play: T-Ball, Minor B, Minor A, and the Majors. The Sundown Little League had between seven and nine T-Ball teams, eight to ten Minor B teams, six Minor A teams and six Majors teams.

[2]T-Ball is the most basic level of baseball in the Sundown Little League. It is for children between five and seven years old. The players use a soft, pliable baseball. They hit the ball off a batting tee using a special T-Ball bat. There are no strikeouts. The players are not allowed to bunt or steal bases. Each team consists of between 12 and 14 players. On defense, each player on the team plays each inning and must be rotated from his or her position after each inning. No score is kept of the game, and the batters bat once through the lineup for the first two innings and then once through the lineup or until three outs are recorded in the later innings.

[3]Sundown's Minor B is the level just above the T-Ball level. It is for children between seven and nine years old. Ten players play on defense each inning. Each player on the team must play a minimum of six consecutive defensive outs and the players bat around in the batting order regardless of their defensive status. The players use a pitching machine. The players are allowed to bunt the ball and, during the second half of the season, the players are allowed to steal bases. Once a team has scored five runs, and is ahead by at least five runs, their inning is over. Minor A is similar to Minor B, but is for children between nine and twelve years old. The players pitch the ball. At the Minor A level, the "five run rule" is also in effect. On defense, each player must play six consecutive defensive outs and bats regardless of his or her defensive status. All other Little League rules in the Official Regulations and Playing Rules Book govern this level of play.

other cause except to the extent and in the amount covered by accident or liability insurance."

The league's safety officer brought information to the Sundown Little League board that flip-up shatterproof sunglasses would offer protection from losing the ball in the sun, but the board decided against purchasing these glasses based upon their cost. Prior to the accident, no one in the league told West or his parents shatterproof flip-up type sunglasses could be good protection from eye injuries. West also had heard an umpire, who was also a coach, state that sunglasses were not allowed during games. Based on unknown statements made to West's mother by coaches and the above quoted language from the application, West's mother "believed that [her] son was not allowed to use any type of equipment other than that provided to him by the team."

West was injured on May 30, 1997. Just before the scheduled game that day, West's team was on the field. The other team was in its dugout. West was scheduled to play outfield. Coach Hughes stood on the third base line approximately halfway between third base and the outfield fence. He sent some of his players, including West, to center field to take fly ball practice. The sun was shining and located somewhere behind Coach Hughes as he faced center field. Thus, the boys in center field were facing the afternoon sun as they were taking practice.

The league's safety officer had warned coaches against hitting practice fly balls into the sun. Coach Hughes testified he was throwing warm-ups, not intentionally trying to get the boys to practice catching a fly ball that might get lost in the sun. Nevertheless, Coach Hughes believed West was sufficiently skilled to deal with losing a high fly ball in the sun. Prior to his injury, West had not received instruction as to how to deal with balls lost in the sun.

West was either the second or third boy in line for this drill. One of the first two caught the ball thrown from Coach Hughes; the other lost the ball in the sun. As Coach Hughes threw the ill-destined ball, West saw it but lost the ball in the sun while it was still going up. The ball came down and struck him in the left eye, causing permanent injury to the eye.

West filed his complaint against the defendants, including his local league, Little League Baseball Incorporated, and the coaches and agents of the league (Dennis Hughes, Ed Krager, and Bob Whitaker). The complaint alleged a single cause of action for negligence. The complaint alleged the defendants were negligent and they increased the risk of harm to West by

their actions. Each of the defendants answered the complaint and asserted the affirmative defense of assumption of the risk.

Defendants brought a motion for summary judgment based on primary assumption of the risk. West opposed the motion.

With his opposition, West filed the declaration of Donald Sinn, a purported expert on the subject of consulting for recreation and park planning and management. Sinn opined the sun would not have been a significant risk to West as he was playing in the outfield during a game because the field was oriented on a north-south axis from center field to home plate.[4] Sinn also asserted that Coach Hughes "significantly enhanced" and "maximized" the inherent risk of losing the ball in the sun by the physical configuration of the practice drill. Sinn averred Coach Hughes knew or should have known that catching pop flies in the sun was a skill beyond the level of first year minor league players. He stated "players need to know how to protect their heads and faces while looking for the ball. Indeed, even professional ball players wearing flip-up [sunglasses] are at some risk doing this activity; making ten[-]year-old children attempt this feat without any training or eye protection is extremely negligent."

Defendants filed written objections to Sinn's declaration on the grounds that it contains matters not appropriate for expert opinion, Sinn does not have the qualifications and foundational facts necessary to express an expert opinion, he lacks personal knowledge of the matters about which he testified, and his declaration is irrelevant. Despite defendants' repeated efforts to obtain a ruling on these objections, the trial court refused to address them because, in its words, it "just concentrated on primary assumption of the risk and . . . really didn't consider much the declaration to throw out part of the expert's testimony." Under the circumstances, the objections are preserved for appeal. (*City of Long Beach v. Farmers & Merchants Bank* (2000) 81 Cal.App.4th 780, 785 [97 Cal.Rptr.2d 140].)

In granting the summary judgment motion, the trial court concluded being struck by a baseball, losing it in the sun, and changing lighting conditions

---

[4]This orientation is inconsistent with the preferred orientation called for by the Rules of Major League Baseball. Rule 1.04 of these rules states, in pertinent part, "It is desirable that the line from home base through the pitcher's plate to second base shall run East Northeast." Thus, during an afternoon game at a regulation baseball field, the sun is in the eyes of the outfielder and not the batter who is trying to hit the ball.

The preferred orientation of the field also explains the origin of the term "southpaw." "Humorist Finley Peter Dunne, then a sportswriter, coined this word for a left-handed baseball pitcher while covering sports in Chicago in the 1880s. Home plate in the Chicago ball park was then to the west, so that a left-handed pitcher released the ball from the 'paw,' or hand, on the south side. The word soon came to describe any left-hander." (Hendrickson, The Facts on File, Encyclopedia of Word and Phrase Origins (1987) p. 495.)

are inherent risks of the sport of baseball. The court further concluded the defendants had no duty to affirmatively decrease any of these inherent risks, and defendants' actions did not increase these inherent risks. Thus, the court found West's complaint barred by the doctrine of primary assumption of the risk. The court also found the application form irrelevant to its analysis.

## DISCUSSION

### A. *Assumption of Risk*

West argues the trial court erred in "finding that as a matter of law the defense of primary assumption of risk applied to the particular conduct and defendants in question . . . ." We disagree.

"Primary assumption of risk arises where a plaintiff voluntarily participates in an activity or sport involving certain inherent risks; primary assumption of risk . . . bar[s] recovery because no duty of care is owed as to such risks." (*Connelly v. Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8, 11 [45 Cal.Rptr.2d 855].) Whether, in a given case, the doctrine will be applied is a legal question which turns on the nature of the sport or activity in question and on the parties' general relationship to the activity and to each other. (*Knight v. Jewett* (1992) 3 Cal.4th 296, 313 [11 Cal.Rptr.2d 2, 834 P.2d 696].) The conclusion that primary assumption of risk applies is the conclusion defendant owes no duty of care to the plaintiff. (*Id.* at pp. 314-315.) In *Knight,* our Supreme Court concluded that the defendant owed no duty of care to a coparticipant he injured in a touch football game, absent evidence the defendant intentionally injured the plaintiff or engaged in reckless conduct that is totally outside the range of ordinary activity involved in the sport. (*Id.* at pp. 318, 320-321.)

Similar facts to those before us were presented to Division Three of the Court of Appeal, Fourth Appellate District. (*Balthazor v. Little League Baseball, Inc.* (1998) 62 Cal.App.4th 47 [72 Cal.Rptr.2d 337] (*Balthazor*).) In *Balthazor*, 11-year-old Ryan Balthazor was injured when an errant pitch hit him in the face while he was at bat. (*Id.* at pp. 48-49.) The plaintiff claimed the defendant breached a duty of care by, inter alia, (1) failing to end the game as sunset approached and inadequate lighting conditions began to prevail, and (2) failing to provide batting helmets with face guards. The Court of Appeal affirmed summary judgment for the defendant, concluding the risk of being hit by a wild pitch is inherent in the sport of baseball. (*Id.* at pp. 49, 51-52, 53.)

In rejecting the first argument concerning the lighting conditions, the court explained: "Baseball is played under various lighting conditions, even

during the day. On a bright sunny day, the position of the ball relative to the sun can result in an increased risk of being hit by either a thrown or batted ball. Changing lighting conditions are inherent in the sport. It was not dark when the injury occurred, the sun had not set, and Balthazor admitted he saw and avoided the first pitch. Balthazor's injury was simply a result of an inherent risk in the sport . . . ." (*Balthazor, supra,* 62 Cal.App.4th at pp. 51-52.)

On the second point, the court rejected Balthazor's contention the league should have provided face guards. The league, in its supervisory control of the game, assumed the role of instructor. (*Balthazor, supra,* 62 Cal.App.4th at p. 50.) "An instructor[, however,] is not an insurer of the student's safety." (*Ibid.*) Instructors " ' "have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." ' [Citations.]" (*Ibid.*) "Under primary assumption of risk, the defendant has a duty not to increase the risks inherent in the sport, not a duty to decrease the risks." (*Id.* at p. 52.) There is no duty to provide additional safety equipment over that normally worn by the team. (*Ibid.*) The court explained: "In *Fortier* v. *Los Rios Community College Dist.* [(1996)] 45 Cal.App.4th 430 [52 Cal.Rptr.2d 812], the court rejected the plaintiff's contention that failure to provide specific safety equipment, in that case a helmet, increased the risk of injury in noncontact football." (*Balthazor, supra,* 62 Cal.App.4th at p. 52.) " 'To impose the duty to provide such equipment on schools and other supervisors and organizers of such sport in order to avoid liability for injuries inherent in the rough and tumble of such activity would have enormous social and economic consequences. [Citation.] The opportunities to participate in organized, recreational football would be significantly diminished.' " (*Ibid.*) The *Balthazor* court concluded, "Here, the face guard which Balthazor argues should have been required was not part of the normal safety equipment used by the League. The League's failure to require additional equipment did not increase a risk inherent in the sport: that a player might be struck by a carelessly thrown ball." (*Ibid.*)

The declaration of West's expert, Donald Sinn, does not raise a triable issue of material fact as to whether defendants "increase[d] the risks to [West] over and above those inherent in the sport." (*Knight v. Jewett, supra,* 3 Cal.4th at p. 316.) As defendants correctly pointed out in the trial court, absent from Sinn's declaration is any evidence that he had personal knowledge of the layout of the Little League diamond upon which West was injured. (Evid. Code, § 702.) Moreover, the motion of the sun and its effects on a baseball field and baseball players are matters of common knowledge, not the proper subject of expert testimony. (Evid. Code, § 801.) Sinn's

conclusion that defendants "significantly enhanced" and "maximized" the inherent risk of losing the ball in the sun is an inadmissible legal conclusion. (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 266 [80 Cal.Rptr.2d 196] ["Opinion testimony is inadmissible and irrelevant to adjudging questions of law."].) Thus, we are left with Sinn's opinion that the coach should have known that catching pop flies in the sun is a skill beyond the level of first year minor league players. This does not raise a triable issue because, as we will explain, (1) losing sight of a pop fly in the sun is a risk inherent in baseball no matter what the level of play, and (2) placing baseball players in practice or warm-up situations that replicate game conditions does not, as a matter of law, increase the risk over and above that inherent in the sport.

The juxtaposition of the sun and a baseball, either in practice, during pregame warm-ups or during a game, is an inherent risk in the game. Being hit by that same ball after it disappears into the sun is a risk of the game. Many a pop fly has disappeared in the sun to a player on the ground. Sometimes it falls harmlessly away from the player. Other times, the ball bounces off the player's mitt. And sometimes, it hits the player trying valiantly to fight off the glare of the sun. Tragically, in this case, the ball caused a serious injury. Nothing the coach or the league, or Little League Baseball Incorporated, did, however, increased these fundamental risks inherent in baseball.

The orientation of the field versus the orientation of the drill does not change the analysis. Baseball is not a static game. The players and balls move across the field at all angles and directions. A fly ball down the right field line would travel at the same trajectory as the ball thrown from the third base line to center field. An overthrow from third to second also would follow this path in relation to the sun. As noted above,[5] the fielders on a regulation baseball field are always faced with this danger during an afternoon game.

Furthermore, the league and its coaches had no obligation to provide additional safety equipment to its players. Their obligation was to not increase the risk of the game, not to affirmatively protect the players by providing nonstandard equipment to its fielders.

Defendant urges us to focus on the level of play of the minor league as a ground to avoid applying primary assumption of risk. There is nothing legally significant, however, about the level of play of the "minor leagues" of Little League baseball versus other levels of play. Minor league teams can

---

[5]See footnote 4, *ante.*

be just as competitive as major league teams, as shown by the testimony of the league's safety officer. Anyone who has been to a Little League ballpark on a Saturday morning can attest to that fact. Fly balls occur in every level of baseball. The ball is the object of the game and hitting it as hard and far as you can is often the key to scoring runs.

Plaintiff's reliance on this court's decision in *Bush v. Parents Without Partners* (1993) 17 Cal.App.4th 322 [21 Cal.Rptr.2d 178] is misplaced. In a two-to-one decision, the majority held that dancing was not a sport to which the primary assumption of risk applied. (*Id.* at p. 328.) As noted by the majority in *Bush,* the primary assumption of risk rule has been applied " 'in situations involving a wide variety of active sports, ranging from *baseball* to ice hockey and skating.' " (*Ibid.*, italics added.) *Bush* simply has no application here.

It is not legally significant that this accident happened during a pregame warm-up drill rather than during the game itself. A major purpose of practice and warm-up drills is to place the players in situations that replicate game conditions to enable and "encourage the participants to play the game as it should be played." (*Fortier v. Los Rios Community College Dist., supra,* 45 Cal.App.4th at p. 436.) In their practices, coaches and instructors may make mistakes. Where those mistakes are not outside the range of ordinary activity for the sport, the coaches are not liable if injuries result from their missteps. (*Kane v. National Ski Patrol System, Inc.* (2001) 88 Cal.App.4th 204, 213-214 [105 Cal.Rptr.2d 600] [ski instructor not liable for injuries caused when instructor failed to properly assess the conditions and the skill level of his pupils].)

Coaches must be free to push their players to levels that may, in hindsight, be beyond the students' abilities. (*Bushnell v. Japanese-American Religious & Cultural Center* (1996) 43 Cal.App.4th 525, 531 [50 Cal.Rptr.2d 671].) In *Bushnell,* a student was injured during a judo class practice when a volunteer instructor injured the student during a training session. (*Ibid.*) In concluding the primary assumption of risk doctrine applied to this conduct, the court stated: "Instruction in an activity such as judo necessarily requires pushing a student to move more quickly, attempt a new move, or take some other action that the student previously may not have attempted. That an instructor might ask a student to do more than the student can manage is an inherent risk of the activity. Absent evidence of recklessness, or other risk-increasing conduct, liability should not be imposed simply because an instructor asked the student to take action beyond what, with hindsight, is found to have been the student's abilities. To hold otherwise would discourage instructors from requiring students to stretch, and thus to learn, and

would have a generally deleterious effect on the sport as a whole." (*Id.* at p. 532.) "To instruct is to challenge, and the very nature of challenge is that it will not always be met." (*Id.* at p. 534.)

■ Here, we reject West's contention the setup of this drill constituted recklessness or risk-increasing conduct for which liability should attach. In this drill, the coach duplicated a common scenario under which the game is played. It is not sound public policy to encourage coaches not to practice this common situation and allow his players to experience it for the first time under the stress of game conditions.

West relies on three decisions for the proposition defendants increased the risks of injury during this drill. In *Galardi v. Seahorse Riding Club* (1993) 16 Cal.App.4th 817 [20 Cal.Rptr.2d 270], a rider was injured when she fell from the horse on which she was training. She sued the instructor claiming he caused her to jump over fences that were unreasonably and unnecessarily high and improperly designed, located and spaced. (*Id.* at p. 819.) While recognizing that the risk of a fall is inherent in the sport of horseback riding, the court concluded the defendant nevertheless owed a duty "to avoid an unreasonable risk of injury to plaintiff and to take care that the jumping array was not beyond the capability of horse and rider." (*Id.* at p. 823.)

Similarly, in *Tan v. Goddard* (1993) 13 Cal.App.4th 1528, 1531 [17 Cal.Rptr.2d 89], a student jockey was instructed to ride a lame horse in the wrong direction on an unsafe track. The appellate court concluded the instructor owed the jockey a duty of care "to see to it that the horse he assigned Tan to ride was safe to ride under the conditions he prescribed for that activity." (*Id.* at p. 1535.)

In *Branco v. Kearny Moto Park, Inc.* (1995) 37 Cal.App.4th 184, 187 [43 Cal.Rptr.2d 392], the plaintiff sued the owner, operator and designer of a bicycle motocross (BMX) racing course when he injured himself on one of the jumps on the course. The appellate court reversed the trial court's grant of summary judgment based upon primary assumption of risk. The appellate court stated, "It is not unreasonable to expect a BMX course to refrain from utilizing jumps which by design create an extreme risk of injury. Certainly the jumps, and falls, are inherent to the sport, and under the doctrine of primary assumption of risk, there is no duty to eliminate the jumps entirely, and no duty to protect from injury arising from reasonably designed jumps. However, the sport does not inherently require jumps which are designed in such a way as to create an extreme risk of injury. Accordingly, premised on the duty not to utilize dangerously designed jumps, this case falls under the

secondary assumption of risk category, and issues pertaining to Branco's comparative fault are for the trier of fact to decide." (*Id.* at p. 193, fn. omitted.)

These cases are all applications of the general proposition that a defendant owes a duty not to increase the risks inherent in the sport. While falling off a horse is inherent in horseback riding, the defendants in *Galardi* and *Tan* increased the inherent risk by creating extraordinarily dangerous conditions. In *Branco,* falling during BMX events is also part of the sport. Putting in jumps which by design create an extreme risk of injury increased the inherent risk by creating extraordinarily dangerous conditions.

Here, we have no similar conduct on the part of the defendants. The simple fact remains, three inherent components of the sport of baseball are the ball, the player and the sun. These three components mix frequently. Lining up these kids for this drill did not create extraordinarily dangerous conditions for which the coaches, the league or Little League Incorporated are liable.

### B. *Waiver*

West also contends "defendants waived the defense of assumption of risk to the limit of their insurance." We reject this contention.

■ Waiver is the intentional relinquishment of a known right. (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 31 [44 Cal.Rptr.2d 370, 900 P.2d 619].)

■ The only evidence presented by West in opposition to the summary judgment motion on the issue of waiver was the application form. The application form does not establish the intentional relinquishment of the affirmative defense of primary assumption of the risk. The application form acknowledges "participation in baseball or softball may result in serious injuries and protective equipment does not prevent all injuries to players . . . ." The application waives the liability of the local Little League, Little League Baseball Incorporated, and its coaches for injuries "except to the extent and in the amount covered by accident or liability insurance." This form does not demonstrate the league's intent to waive affirmative defenses to any future unknown claims brought by players injured in its league activities. Moreover, West provided the trial court with no evidence that West's injuries were covered by any accident or liability insurance.

West claims the league president and others made statements after the accident occurred suggesting waiver. West's statement of undisputed facts

cites two pages of Patricia West's deposition that are not in the record. Because we are reviewing a motion for summary judgment, the relevant facts are limited to those set forth in the parties' statements of undisputed facts, *supported by affidavits and declarations*, filed in support of and opposition to the motion in the present case, to the extent those facts have evidentiary support. (Code Civ. Proc., § 437c, subd. (b); *Lyons v. Security Pacific Nat. Bank* (1995) 40 Cal.App.4th 1001, 1006-1007 [48 Cal.Rptr.2d 174].) Because there is no evidence of these statements in the record, West has not met his burden of establishing there was a triable issue of fact. (*Hernandez v. Modesto Portuguese Pentecost Assn.* (1995) 40 Cal.App.4th 1274, 1279 [48 Cal.Rptr.2d 229].)

## DISPOSITION

The judgment is affirmed. Defendants shall recover their costs on appeal

Scotland, P. J., and Blease, J., concurred.

Appellants' petition for review by the Supreme Court was denied May 22, 2002. George, C. J., and Baxter, J., did not participate therein.