Filed 10/1/14  Sonetti v. Huntington Beach Union High School Dist. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MARK SONETTI II,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>HUNTINGTON BEACH UNION HIGH SCHOOL DISTRICT et al.,<br><br>    Defendants and Respondents. | G049198<br><br>(Super. Ct. No. 30-2012-00580070)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, James Di Cesare, Judge.  Reversed.

Allen Flatt Ballidis & Leslie, and Michael C. Bock for Plaintiff and Appellant.

Gibeaut, Mahan & Briscoe, Gary R. Gibeaut and John W. Allen for Defendants and Respondents.

\*          \*          \*

# I.  INTRODUCTION

This is a high school football injury case.  The plaintiff, Mark Sonetti, was hit from behind during a kickoff coverage drill.  He lurched forward, striking another player with his chin.  He broke his jaw.  Sonetti has filed this action against Huntington Beach High Union School District alleging his injuries were the result of the district's negligence.  The district filed a successful motion for summary judgment based on primary assumption of the risk, and Sonetti has taken this appeal.

The law of assumption of the risk as regards sports injuries is easy to conceptualize, but sometimes hard to apply:  The plaintiff assumes the normal, inherent risks in the sports activity, but does not assume increased risks attributable to the defendant, usually an organizer, instructor, or promoter.  As we explain below, the basic rule is that courts should ascertain what is the standard practice as regards a given safety feature in an organized sporting activity.  Going the extra mile beyond what is normal, or providing safety precautions beyond what is standard practice, is not required of a defendant.  But complying with *standard*, *customary* safety procedures is.  Sonetti argues that supplying helmets and mouthguards is a standard, customary safety procedure that would have prevented or ameliorated his injury.

The case comes to us on summary judgment, so the conflicts in the evidence and the reasonable inferences to be drawn from it are resolved in favor of plaintiff.  Here, the district failed to establish that kickoff coverage drills are normally run without helmets.  The evidence is conflicting on the point, and there is evidence from which an inference may be drawn that standard practice is for kickoff coverage drills to be run *with* helmets at the time Sonetti was injured.  Moreover, even the district admitted it is standard practice to supply mouthguards for kickoff coverage drills and the evidence is conflicting as to whether the district actually supplied them for the practice that injured Sonetti.  Accordingly, we reverse.

2

## II. FACTS

In August 2011 Sonetti played football for Fountain Valley High School for three years. He had made the varsity team in his junior year, and was returning as a varsity player for his senior season. In each of his previous seasons, helmets and mouthguards had been used in all fall kickoff coverage drills.[1]

There is no dispute that it is standard practice in kickoff coverage drills for players to wear mouth guards. In fact, Fountain Valley's coach testified at his deposition that a player would not be allowed to be in the drill if he wasn't wearing one.[2] Sonetti testified at his deposition that mouthguards were normally given out to the players when they received their helmets. The evidence on summary judgment, however, was uncontradicted that the team's helmets had not yet arrived by the Monday of the kickoff coverage drill.[3] Shoulder pads had been given out the preceding Saturday, but Sonetti testified that he wasn't given a mouthguard when he picked up his shoulder pads.[4] For his part, coach Shipp was only able to testify that mouthguards "should" have been given out, or that he "wanted to think" they had been. His testimony did not establish that mouthguards had been actually given out. He also indicated that mouthguards normally

---

[1]    Sonetti testified directly to that fact in his deposition. No *fall* kickoff coverage drill had ever been run without a helmet. Sonetti's coach, defendant John Shipp, also admitted as much at his deposition. We reproduce the relevant swath of testimony:
"Q. Okay. When it's anything short of a full contact drill, are helmets required, in your opinion?
"A. Yes, sir.
"Q. Okay. What is the key determining factor or factors that triggers the need for helmets?
"A. Well, I mean, helmets – the helmets, if we can wear helmets, we're going to wear helmets. That's what we do. Because the kids need to wear them so they get used to wearing the helmets and keeping their heads up and being able to tackle properly.
"Q. *If the helmets had arrived prior to the day of the accident, would the players have been wearing them during that particular kickoff drill?*
"A. *Yes, sir.* Had they been fitted properly, yes." (Italics added.)

[2]    Shipp said at one point, "I mean, all of our kids are supposed to be wearing mouthguards." And when asked: "For the particular kickoff coverage drill in which Mark was injured, if you realized he wasn't wearing a mouthpiece, you would have sent him to go get a mouthpiece. [¶] Right?" he answered "Absolutely."

[3]    As shown by an uncontroverted statement from the team's equipment manager.

[4]    The relevant testimony was:
"Q. And when you picked up your shoulder pads the Saturday before your injury, did you also pick up a mouthguard?
"A. I don't believe so."

come attached to the helmets, a fact that would buttress the inference mouthguards were not given out to team members prior to Monday's practice since helmets had not yet arrived.[5]

As to those helmets, we recount in the margin the particular part of coach Shipp's deposition testimony relied on by the district as to whether it was standard practice to run kickoff coverage drills with helmets *in the fall*.[6] There is no dispute *spring* drills are not normally run with helmets (Sonetti himself testified to that) but as to the fall, Shipp's testimony is less than pellucid.

There is also no dispute in the record as to what the kickoff coverage drill run that Monday was to entail: There was to be no tackling. However, *blocking* was envisaged, and coach Shipp admitted that, in the context of the drill, a defender running down the field could end up being blocked.[7] As Sonetti described what happened, he

[5] "Q. The mouthguards are attached to the helmets. [¶] Right?
"A. No. Well, they should be, but they were given – they get their own individual mouthpiece and they should have been given that.
"Q. Okay.
"A. That day. [In context, the "day" being referred to appears to be the Saturday when the shoulder pads were handed out.]
"Q. Do you know if the mouthguards had been given out prior – strike that. [¶] For the season in which the accident occurred, do you know if the mouthguards had been given out for that season prior to the day of the accident?
"A. They should have been.
"Q. Do you know whether they were or not?
"A. I would like to think yes, but I can't – I can't recollect."

[6] Here it is:
"Q. Whatever those parameters are, on how many prior occasions, and you can do it percentagewise or give me an estimate as to the number of times, great, had you conducted that exact type of coverage drill before in which the players did not wears helmets?
"A. You know, you just, you mentioned 1,000 times, a little bit of an exaggeration, but that's a drill that was practiced many times.
"Q. And the players habitually would not wear helmets?
"A. Yes, sir.
"Q. How about after the accident? After the accident, how many occasions was the drill conducted in which the players weren't wearing helmets?
"A. I think it would be standard, *depending on what we have, with respect to whether it was spring or summer*, we would run the drill accordingly." (Italics added.)
Huh?

[7] Here is the testimony:
"Q. Okay. For this particular kickoff coverage drill, were the players instructed to only block the individual in their lane or were they to pick up multiple people to block? How was the blocking supposed to be handled?

4

was running down the field in his lane, when he was blocked (or pushed) from behind, and went into the upper torso of an adjacent player, resulting in his injuries.

After Sonetti filed this action for negligence, the district brought a motion for summary judgment. The district's evidence for the motion consisted mainly of excerpts of Sonetti's and Coach Shipp's depositions. The district did not submit any expert testimony establishing that high school kickoff coverage drills in California are normally run without helmets. It did, however, assert in its points and authorities the rather remarkable position that, "Absence of football helmets does not increase the risks inherent in football." Sonetti's opposition included the declaration of a sports safety expert (Marc Rabinoff) who opined that contact football "must be played with helmets and mouthguards," and that kickoff drills are "one of the most dangerous plays in all of football due to high rates of speed and the likelihood of violent collisions."[8]

The trial court granted the motion. It ruled that the doctrine of primary assumption of the risk applied to bar Sonetti's action. The court reasoned that "bumping, blocking and falling are inherent in football." As to helmets, the court relied on coach Shipp's testimony which the court characterized as "Players run the kick-off drill without helmets often." As to the concession that helmets would have been used if available, the court cited Coach Shipp's testimony that the reason for doing so was to have the players get used to their helmets and "improve tackling." The trial court read Shipp's testimony as saying that having helmets had nothing to do with safety. As to mouthguards, the court simply said, "Defendants required use of a mouthguard, but were unsure if plaintiff had one or not."

---

"A. Well, the blocking is they were supposed to stay in their lane. And if a defender came in their lane, that would be the person."

[8] Dr. Rabinoff's declaration, however, did not say whether the normal practice of high school coaches in California is to run kickoff coverage drills with or without helmets.

5

## III.  DISCUSSION

A. *The Law on Assumption of Risk in Sports in the Context of Safety Measures*

Sports injuries are well-covered territory in the law of assumption of the risk.  The basic rule, as we said, is easily stated:  Plaintiffs assume the risk inherent in the sport or activity, but do not assume *increased* risks caused by the defendant.  "Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport."  (*Knight v. Jewett* (1992) 3 Cal.4th 296, 315-316.)

Clarity is more problematic after that.  The cases come in a variety of permutations, of course, and do not always (or even often) focus on the presence or absence of some safety feature or precaution.  Some turn on causation.  (E.g., *Connelly v. Mammoth Mountain Ski Area* (1995) 39 Cal.App.4th 8 [doctrine of assumption of the risk applied where absence of extra padding on ski lift tower did not cause skier to collide with tower].)[9]  Some turn on deficiency in the quality of instruction.  (E.g., *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990 [doctrine of assumption of the risk not applied where swim instructor made plaintiff dive into shallow pool, causing her a broken neck].)

But there is a small body of cases in the assumption of risk area which turn directly on whether the absence of some safety precaution was inherent in the activity, or is normally an aspect of the activity.  (Cf. *Knight, supra,* 3 Cal.4th at p. 317 ["Other cases

---

[9]  *Connelly* is a causation case.  It incidentally touched on the topic of safety features, but mainly as a kind of rhetorical buttressing of its causation rationale.  The court observed the plaintiff had not presented evidence that ski operators are "required" to have a given amount of padding on ski lift towers in case of the eventuality that a skier ran into one of them.  (Cf. *Connelly, supra*, 39 Cal.App.4th at pp. 12-13 ["Nor are we aware of any relevant legal authority in California, and we have not been directed to any, *requiring* a ski area operator to pad its ski lift towers.  It would be anomalous to hold an operator who padded its towers-as Mammoth did here – more liable than an operator who failed to do so."].)  The *Connelly* court didn't develop the theme of padding on ski lift towers, but the implication from what it did say is that such padding is not industry standard.

also have analyzed in a similar fashion the duty of the owner of a ballpark or ski resort, in the process defining the risks inherent in the sport not only by virtue of the nature of the sport itself, but also by reference to the steps the sponsoring business entity reasonably should be obligated to take in order to minimize the risks without altering the nature of the sport."].)  This case takes us into this little eddy of assumption of the risk law.  Sonetti's theory is that by not supplying helmets or mouthguards, the district fell below its standard of care for organizing high school football.

The cases in regard to safety measures and sports present a remarkably consistent rule:  The question of whether the plaintiff's claim is barred by assumption of the risk must focus on a norm or industry standard or practice.

In *Balthazor v. Little League Baseball, Inc.* (1998) 62 Cal.App.4th 47, 52, the question was whether the organizer should have provided batters helmets with faceguards.  Helmets had already been provided.  The appellate court upheld application of assumption of the risk because "the face guard which Balthazor argues should have been required *was not part of the normal safety equipment used by the League*."  (*Id*. at p. 52, italics added; see *id*. at p. 51 ["each factor was in reality a normal aspect of Little League baseball as played by youngsters everywhere"].)

In *Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 257, a passenger in the rear of a raft holding a camera with one hand and the raft with the other suddenly struck her head on a metal frame of a surface used to hold supplies on the raft.  She claimed the raft might have been safer if it didn't have a metal frame.  The court rejected that argument because metal frames were "the industry standard" and there was "no evidence of the availability or feasibility of safer alternatives to the industry standard, or of safety features such as padding or helmets."  (*Id*. at pp. 256-257.)

And in *American Golf Corp. v. Superior Court* (2000) 79 Cal.App.4th 30, the question was whether the design and placement of a yardage marker might have decreased the risk of injury from an errant golf ball that had ricocheted off the marker.

7

The court rejected the plaintiff's claim that the yardage marker should not have been located so close to the fairway. The court rejected the claim because the yard markers are "common in the golf industry" and the system of yardage markers used by the defendant could be found on 20 to 25 percent of golf courses nationwide. Thus there was no *increase* in the normal danger posed by golfing from the placement of the yardage marker. (*Id*. at p. 35.)

On the other hand, the same principle favored the plaintiff in *Saffro v. Elite Racing, Inc.* (2002) 98 Cal.App.4th 173. There the failure of the organizer of a marathon to provide sufficient quantities of water and electrolyte replacement fluid on a warm June day in San Diego was held *not* to be excused by the doctrine of assumption of the risk. The organizer's providing such fluids was in the "nature of the sport." (*Id*. at p. 179.) The plaintiff had presented evidence that it is *customary* in marathon running that organizers provide "water and electrolyte fluids at regular intervals." (*Id*. at p. 176.)

And in *Rosencrans v. Dover Images, Ltd.* (2011) 192 Cal.App.4th 1072, the doctrine of assumption of the risk was held not to apply in a case of what is perhaps the archetypical inherently dangerous sport – motocross. (See *id*. at p. 1083 ["Motocross is a sport in which people ride motorcycles and perform jumps off of ramps, while in a setting filled with dust and other people on motorcycles."].) The reason it didn't apply was the absence of a normal safety feature: a "caution flagger" at a certain platform. The appellate court noted "it is *standard practice* in the industry to have caution flaggers on their platforms at all times." (*Id.* at p. 1086, italics added.) However, because a caution flagger was not at his post, there was no one to alert the motorcyclist who had been following the plaintiff that plaintiff had just fallen. The plaintiff was struck by that motorcyclist while picking up his motorcycle. (See *id*. at pp. 1087-1088.)

Nothing in the main case on which the trial court relied, *Fortier v. Los Rios Community College Dist.* (1996) 45 Cal.App.4th 430, contradicts the standard practice,

what-is-customary, "industry standard" approach to safety precautions. *Fortier* is, in fact, consistent with the rule.

The trial court relied on *Fortier* mainly because it is a football case. The case arose out of a physical education class structured for ordinary students, as distinct from players on the college's own team. The students who enrolled in the "advanced football" class were *never* going to be given shoulder pads or helmets, at least in that class. As the *Fortier* court expressly noted, the plaintiff, "along with 50-60 other students," had "enrolled in an 'advanced football' class," and according to the course syllabus, the objectives of that class were to develop an appreciation for football, perform advanced offensive and defensive techniques, and apply appropriate football strategy." Thus, said the court, "*Helmets and pads were neither required nor provided because the on-field practice drills were 'non-contact' drills, i.e., no tackling was permitted.*" (*Fortier, supra,* 45 Cal.App.4th at 432-433; italics added.)].)

The injury in *Fortier* occurred during a "seven-on-seven" drill, which simulates a real world passing play, except the four interior linemen are omitted from the teams. (The idea is the eight linemen have all fought to a standstill in the trenches, so the play boils down to the "skill position.") The plaintiff, a wide receiver, ran up the field, his eyes on the ball. Unfortunately a defender, playing free safety, also had his eye on the ball, the two players collided, and the safety's elbow fractured the plaintiff's left eye socket. (*Fortier, supra*, 45 Cal.App.4th at p. 433.) As noted, the seven-on-seven drill had been conducted without helmets because the class did not anticipate tackling. The plaintiff argued that defenders should have been instructed to affirmatively avoid pass receivers in such drills. That was nonsense, said Justice Puglia, who noted that aggression is inherent "at all levels of competition" of football, including touch football and flag football. It would be ridiculous to expect pass defenders not to try to intercept

9

the ball. That possibility, of course, implied an inherent risk of collision. (*Id*. at p. 437.)[10]

Given that there was no intention in the "advanced football" class which the plaintiff had signed up for that players would *ever* need helmets or shoulder pads, the plaintiff in *Fortier* did not initially formulate his claim in terms of a duty on the part of the school to supply helmets. (See *Fortier, supra*, 45 Cal.App.4th at p. 436 [none of the three ways in which the school supposedly breached its duty of care included supplying helmets].) However, for the first time on appeal, he argued helmets should have been supplied. Rather than treat the argument as waived, the *Fortier* court rejected it by pointing to the state of the record. Plaintiff had asserted that "'common sense'" militated in favor of wearing helmets to prevent the sort of injuries he suffered, but he offered no evidence to back up that "common sense" proposition. And the school had submitted the uncontradicted declaration of its head football coach that helmets would actually *increase* the risk of injury in a seven-on-seven drill. (*Id*. at pp. 438-439.)[11] Accordingly, the court rejected the plaintiff's argument that helmets should have been given to the players in the drill.

---

[10] "In *every* game of football, touch, flag, or tackle, the object is for the offense to move the ball down the field by running or passing it, and for the defense to stop or impede the progress of the offense. It is a universally accepted defensive tactic to knock down or intercept passes thrown to offensive players. *If instead defensive players were to run away from intended receivers in order to avoid contact, as plaintiff proposes, it would fundamentally alter the game of football* as it is played at all levels of competition, and would run contrary to the Supreme Court's dictum that the 'overriding consideration in the application of primary assumption of risk is to avoid imposing a duty which might chill vigorous participation in the implicated activity and thereby alter its fundamental nature.'" (Second italics added.)

[11] "Although *the record contains no such evidence*, we shall assume a helmet would have protected plaintiff from the type of injuries he suffered. However, there is no evidence that a helmet would protect the players from other types of injuries they might suffer in a similar collision.

"More significantly, *there is evidence in the record that wearing a helmet might actually increase the risk of injury.* In his declaration in support of summary judgment, Ghilardi [the head coach] states: 'It would not be safe to wear helmets and pads for pre-season practice. The players are generally not ready for contact football at this point because of a lack of physical conditioning . . . . Helmets and pads protect against physical contact. By allowing players to use helmets and pads, even during non-contact drills, it can encourage players to tackle or make other intentional contact. Pre-season, non-contact drills without pads and helmets increase[] safety." (*Fortier, supra*, 45 Cal.App.4th at pp. 438-439, italics added.)

B. *Application*

This case comes to us on summary judgment. Therefore conflicts in the evidence are resolved in favor of the responding party and the responding party is also entitled to all reasonable inferences to be drawn from the evidence. (See *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 ["In ruling on the motion, the court must 'consider all of the evidence' and 'all' of the 'inferences' reasonably drawn therefrom . . . and must view such evidence . . . and such inferences . . . in the light most favorable to the opposing party."].) Applied to this case, this standard of review means the following facts are established for purposes of the district's summary judgment motion:

(1) *No mouthguards were given out.* In combination with Sonetti's statement that mouthguards were normally given out with the helmets, and the fact the helmets did not arrive that Saturday, there is a reasonable inference no mouth guards were given out on the Saturday before the Monday practice. We note that the district, as moving party on the summary judgment motion, did not provide the declarations of any players to the effect that mouthguards had been given out.

(2) *The standard practice of Fountain Valley High School was not to allow players to run kickoff drills without mouthguards.* Coach Shipp said that himself.

(3) *The standard practice of Fountain Valley High was to run fall practices in the fall with helmets, not without them.* Sonetti testified that every time the drill had been run in the fall in the previous three seasons it had been run with helmets. Beyond that, coach Shipp admitted that *if* he had had helmets available, he would have had the players wear them. If standard practice was *not* to wear helmets, coach Shipp might very well have said he *wouldn't* have had the players wear them, just as the coach in *Fortier* had said that in the context of a seven-on-seven drill helmets would *increase* the risk of injury.

11

In light of these facts, we must conclude the summary judgment was error. A trier of fact could reasonably conclude that helmets and/or mouthguards were standard practice and that had the district passed out helmets or mouthguards, Sonetti's injuries would have been prevented or would have been less severe. There is a conflict as to whether mouthguards were passed out. There is no conflict as to whether helmets were passed out – they weren't. So there are triable issues of fact under the present state of the evidence.

It is certainly clear that the district did *not* establish it *is* standard practice in fall kickoff coverage drills to dispense with helmets. Coach Shipp's testimony suggesting helmets weren't used (quoted at footnote 6 above) is wobbly, and his statement the drill would have been run with helmets if they had arrived suggests a standard practice of conducting kickoff coverage drills with helmets. It is hard to read that testimony as anything other than an admission that the only reason Sonetti wasn't wearing a helmet was that they were not yet available. When compared with the unequivocal testimony of Sonetti that in the fall season kickoff drills had always, previously been conducted with helmets, it cannot be said there is no issue as to whether the standard practice of the school was to run such drills without helmets.

Moreover, unlike *Fortier*, here there is no evidence to the effect that helmets are disfavored in the particular drill being run on the counterintuitive theory, relied on by the *Fortier* court, that they increase the risk of injury. Even assuming the trial court was correct to read coach Shipp's testimony to the effect that the *only* reason helmets had been worn for kickoff drills was to accustom players to their helmets and tackling technique and the coach was indifferent to the extra safety provided by helmets, the uncontradicted evidence, from Sonetti's sports safety expert, is that helmets would have been desirable for safety reasons.

12

IV.  CONCLUSION

Vince Lombardi once famously said that practice doesn't make perfect, only perfect practice makes perfect.  The kickoff coverage drill here may have fallen short of that standard as well as the law's.  By not waiting until the helmets and mouthguards arrived, the team lost an experienced player to a broken jaw.  Football has its inherent risks, but in most contexts, including this kickoff coverage drill, the standard practice appears to be mitigation of those risks by playing the game with helmets and mouthguards.  A jury should decide whether that appearance is fact.  It was error to grant the motion for summary judgment.

The judgment of dismissal is reversed.  In the interests of justice appellant shall recover his costs on appeal.


BEDSWORTH, J.

WE CONCUR:


O'LEARY, P. J.


MOORE, J.

13